**Revised August 19, 1998**

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 97-50875

_____


MARTIN SAUCEDA VEGA,

                                        Petitioner-Appellant,

                    VERSUS

            GARY L. JOHNSON, Director,
        Texas Department of Criminal Justice,
            Institutional Division,

                                        Respondent-Appellee.


_____

        Appeal from the United States District Court
            for the Western District of Texas
_____

                    July 30, 1998

Before SMITH, WIENER, and DeMOSS, Circuit Judges.

JERRY E. SMITH, Circuit Judge:


    Martin Vega, who confessed to a murder-for-hire, seeks habeas corpus relief from a sentence of death.  The federal district court denied relief. Because most of Vega's claims are entirely meritless and the others are barred by *Teague v. Lane*, 489 U.S. 288 (1989), we affirm.

## I.

In July 1985, after receiving a report of a homicide, Sheriff Mike Bading discovered the body of James Mims lying alongside a road. Bading and other officers arriving at the same time recovered several items belonging to Mims, including a comb, a screwdriver-type key chain, a pocket knife, and some change. They also found three spent .22 caliber cartridges.

Mims's skull had been hit with a blunt object, possibly a handgun, and he had been shot eight times; his shirt was saturated with blood, and the rest of his clothes were wet from a source other than blood. One of the bullets had passed through his lung, aorta, and heart, probably causing his death. Two .22 caliber bullets were removed from his body and analyzed.

Vega confessed to the murder in January 1988. He stated that Linda Mims had encouraged him to murder her husband, promising to marry him afterward and to give him $30,000 of the $150,000 life insurance proceeds. Vega did in fact marry her and enjoyed substantial sums of money obtained from insurance proceeds.

In one of his statements, Vega revealed the location of the alleged murder weapon, a .22 caliber handgun. This weapon, along with the cartridges allegedly fired by the handgun but not found at the murder scene, were at the specified location and presented at trial. Vega also explained that the victim was wet because of a failed attempt to drown him. Vega insisted that Linda Mims be arrested immediately upon his confession.

Vega made one statement in his handwriting and signed it in the presence of two officers; subsequently he made other statements containing details of the events relating to the murder. He received *Miranda* warnings before confessing.

## II.

### A.

Vega was indicted for capital murder in February 1988, charged with shooting Mims for the promise of remuneration. William Rugeley was appointed to represent Vega. The trial court found that Vega's confession and related statements were made voluntarily and were legally admissible at trial.

Vega apparently disagreed with Rugeley about his defense, so in August 1988 he filed a *pro se* motion to dismiss Rugeley because they did "not agree with each other and [could] not see eye to eye"; Vega claimed he had funds to hire his own attorney who would better serve his interests. At a hearing held in October, the court informed Vega that Rugeley would continue to represent him until he retained counsel of his own, at which time Rugeley would be removed. At no time thereafter did Vega indicate that he had employed counsel.

In January 1989, eleven days before trial, Rugeley filed a motion to withdraw, stating that Vega had refused to communicate with him. The court allowed Vega to state his position, which at

3

that time was that Rugeley had told him to plead guilty even though he was innocent. Rugeley stated that Vega would not cooperate with him, which would cause him to be unprepared for trial. The court refused to remove Rugeley at that late date.

### B.

The jury found Vega guilty. He testified only at the punishment phase, at which the state introduced evidence of previous extraneous offenses as aggravating factors. These offenses included the alleged forcible detention and rape at gunpoint of one Shirley Barnard in 1984. Although in that case Vega was indicted on a sexual assault charge, the charge was subsequently dropped when the government was unable to locate the victim to testify. Instead, the government proceeded to trial on a felon-in-possession charge based on Vega's supposed use of a gun in the alleged rape. Vega was acquitted of this charge and of the lesser included offense of unlawful possession of a handgun.

During the punishment phase of the 1989 capital murder trial, the state called Barnard to testify to the alleged rape, emphasizing Vega's future dangerousness. The jury apparently found this information significant, because it asked to re-examine the evidence of the firearm trial and Barnard's testimony. Vega was convicted and appealed to the Texas Court of Criminal Appeals, submitting *pro se* briefs and motions in addition to those filed by

4

Rugeley.


### III.

Vega argues that the state violated his due process rights by allowing the prosecution to employ, at the appellate stage of the litigation only, Charles Kimbrough, an attorney who had represented Vega during his felon-in-possession trial. Although Kimbrough apparently played no role until after that conviction was obtained, and was limited to the trial record in his briefs and arguments, Vega asks us to find that Kimbrough's involvement made the murder trial fundamentally unfair and that he is entitled to habeas relief. Because such a holding would be an extension of prior law about which reasonable minds could disagree, *Teague* bars the relief Vega requests.

In *Teague*, the Court held that federal courts may not create new constitutional rules of criminal procedure on habeas review. A new rule is one which was not "dictated by precedent existing at the time the petitioner's conviction became final." 489 U.S. at 301. A new rule is created if the rule is, "in light of this Court's precedent, 'susceptible to debate among reasonable minds.'" *O'Dell v. Netherland*, 117 S. Ct. 1969, 1974 (1997) (citing *Butler v. McKellar*, 494 U.S. 407, 415 (1990)). Accordingly, we must examine existing precedent and decide whether, under that precedent, relief is required. If reasonable minds could differ on

5

whether current law requires relief, we may not grant relief without creating a "new rule" barred by *Teague*.

No court of which we are aware has considered the fact scenario presented here. In general, our jurisprudence has considered two relevant types of conflict-of-interest claims: "multiple representation" and "switching sides." Multiple representation occurs when an attorney represents multiple parties with conflicting interests, possibly influencing him to reject a strategy that would produce optimal results for one client, in order to improve results for another. *See, e.g., Cuyler v. Sullivan*, 446 U.S. 335 (1980). Switching sides occurs when an attorney starts out representing one party, then represents an adverse party in the same or related litigation. The extent to which jurisprudence developed in the multiple representation context may be applied to the switching sides context is currently unresolved.[1]

This is a case of switching sides, but not of doing so in the course of a single litigation matter. In such a case, the ethical duty of loyalty prevents Kimbrough from acting against Vega's interests. That duty lasted only as long as the litigation matter, however, and then ceased to restrict Kimbrough's options. *See,*

---

[1] *See Hernandez v. Johnson*, 108 F.3d 554, 559 (5th Cir.), *cert. denied*, 118 S. Ct. 447 (1997) (noting that this circuit "has limited *Cuyler* to actual conflicts resulting from a lawyer's representation of multiple criminal defendants," and assuming *arguendo* that *Cuyler* could apply where a criminal defendant's lawyer had previously served as district attorney when cases were pending against the defendant in that district).

6

*e.g., McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991). Once the matter ended, Kimbrough's only duty was to protect confidential information he received in his capacity as attorney.

If Kimbrough had represented Vega in the possession case and then prosecuted him at the trial level here, we would have to ask only whether the matters were substantially related. If so, the potential for abuse of confidential information obtained through the prior representation would be high, and Vega's trial likely would be deemed fundamentally unfair if Vega had called this conflict to the trial court's attention, or the conflict was obvious to the court. *See Holloway v. Arkansas*, 435 U.S. 475, 490 (1978). Because neither this circuit nor the Supreme Court has considered a situation in which a prosecutor formerly represented the defendant, however, even this might require a new rule.

Still more divorced from existing precedent is the scenario presented here. Not only have we never held that a defendant's former attorney may not handle an appeal against him in a subsequent case, but we would be unlikely to do so without applying a harmless error standard. Unlike the multiple representation standard addressed in *Holloway*, where prejudice is both likely and difficult to identify, the situation here presents little risk of harm to Vega's interests, and there is an easy way to spot abuse should it occur.

Kimbrough was limited to the trial record on appeal and could

not supplement it with facts or observations taken from his prior representation. The only way to abuse his confidential information would be to introduce such extraneous information and hope that the appellate court, while pretending to ignore it as outside the record, would be influenced. Yet Vega fails to point out any instances in which information outside the record was introduced on appeal. Because we could easily identify such a use of confidential information were it present, the argument against harmless error set forth in *Holloway* does not apply.[2]

Vega points to *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 828 (1986), for the proposition that even the appearance of impropriety requires reversal. That case involved the reversal of a state supreme court decision written by a justice whose opinion would have provided precedent favorable to him in a lawsuit he had pending at the time of writing. The Court held that the justice had a conflict of interest and should have been disqualified; its statement that "the 'appearance of justice' will best be served by vacating the decision and remanding for further proceedings" in no way suggested that a decision should be reversed on the basis of a speculative conflict merely in order to maintain the appearance of justice. *Id.* To the contrary, the Court suggested otherwise in *Cuyler*, where it held that a defendant who fails to object to

---

[2] *See id.* ("In the normal case where a harmless-error rule is applied, the error occurs at trial and its scope is readily identifiable . . . .").

multiple representation must show more than a "mere possibility of a conflict of interest" in order to obtain relief. *See Cuyler*, 446 U.S. at 350.

Vega makes no effort to explain how the possession of confidential information could have helped the prosecutor's office, and harmed him, at the appeals stage. Even assuming he could demonstrate some possibility of prejudice, however, reasonable minds could differ as to whether current precedent supported relief. Under *Teague*, we are barred from creating a new rule of law in order to grant relief on this issue.

## IV.

Vega contends that collateral estoppel prevented the state from introducing, at the penalty phase, evidence of his possession of a handgun and sexual assault. He points out that the sexual assault and felon-in-possession charges were brought together, that the sexual assault charge was dropped, that the alleged sexual assault was nevertheless discussed at his felon-in-possession trial, and that he was acquitted of being a felon in possession. Because evidence of prior acts may be introduced despite an acquittal if the standard of proof in the second prosecution is lower, Vega's claim must fail.

In *Ashe v. Swenson*, 397 U.S. 436 (1970), the Court held that collateral estoppel is a requirement of due process under the

double jeopardy doctrine. In *Dowling v. United States*, 493 U.S. 342, 349 (1990), however, the Court held that "an acquittal in a criminal case does not preclude the Government from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof."[3] Extraneous offenses offered at the punishment phase of a capital trial need not be proven beyond a reasonable doubt.[4]

Even assuming, therefore, that the state would have been collaterally estopped from prosecuting Vega for the sexual assault charge, introducing evidence of the offense at the punishment phase of his capital murder trial was not improper. Similarly, although the felon-in-possession charge certainly could not have formed the basis of a new prosecution, it could be introduced as evidence of Vega's future dangerousness, because the jury decided only that the government had not proven the elements of the felon-in-possession offense beyond a reasonable doubt, and had not considered the evidence under any lower standard of proof.

In addition, *Dowling* allows the introduction of evidence in a subsequent prosecution "if the prior acquittal did not determine an ultimate issue in the present case." 493 U.S. at 348. In *Dowling*,

---

[3] *See also United States v. Brackett*, 113 F.3d 1396, 1401 (5th Cir.), *cert. denied*, 118 S. Ct. 341 (1997) (evidence admissible if second proceeding does not require proof beyond a reasonable doubt).

[4] *See Harris v. Johnson*, 81 F.3d 535 (5th Cir.), *cert. denied*, 517 U.S. 1227 (1996); *Turner v. Johnson*, 106 F.3d 1178, 1189 (5th Cir.), *petition for writ of habeas corpus denied*, 118 S. Ct. 27 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988); *United States v. Mir*, 919 F.2d 940, 943 (5th Cir. 1993).

evidence of a prior robbery was appropriately introduced, because the former alleged victim had seen the defendant and could testify as to his identity. This information could have been relevant to the jury, even if it did not believe that the defendant committed the crime previously charged. *Id*. Moreover, we held in *Brackett* that evidence of intent to possess marihuana could be offered at a subsequent trial for conspiracy to possess with intent, despite a prior acquittal at the actual-possession trial. In *Brackett*, although the government reintroduced evidence of the defendant's actual possession, it did so only as evidence to support his agreement to engage in a conspiracy; because the actual possession was not necessary to a conspiracy conviction, the prior acquittal did not determine an ultimate fact in the conspiracy trial. *See Brackett*, 113 F.3d at 1400-01.

In this case, therefore, the evidence is obviously admissible. Not only did the prior acquittal fail to determine the ultimate fact at issue hereSSwhether Vega posed a threat of future dangerousness to societySSand not only did the prior acquittal fail to resolve any questions with respect to the sexual assault, but the evidence was admissible also because the standard of proof at the punishment hearing was lower than that at the original criminal trial.

V.

11

Vega claims the trial court erred by failing to appoint new counsel when Vega called to the court's attention a conflict with his appointed counsel. This claim is meritless, because the court had no duty to appoint new counsel.

Vega's stated conflict was that his attorney recommended he plead guilty, whereas Vega wanted to continue asserting his innocence. Had the attorney refused to allow him to enter a not guilty plea, he would have violated his ethical duty to allow Vega to choose the broad limits of the representation. *See, e.g., Jones v. Barnes*, 463 U.S. 745, 753 (1982). In fact, however, the attorney proceeded to trial on a not guilty plea, and although he expressed concerns that Vega refused to communicate with him, thereby reducing his efficacy, neither he nor Vega claimed any practical conflicts. In addition, Vega and his counsel were often seen conferring at trial, and Vega points to no aspects of the representation that he asked to have done differently.

Furthermore, Vega never asked the court to appoint another lawyer. He did file a motion requesting leave to retain his own counsel, and the court stated that the request would be granted, and his appointed counsel removed, as soon as Vega informed the court he had retained counsel of his choosing. Eleven days before trial, appointed counsel asked to withdraw, stating that no counsel had been appointed and that Vega had refused to communicate with him. It was only at this time that Vega identified the

12

philosophical differences between himself and his attorney. Even then, however, he failed to request the appointment of new counsel. The court's inability to read his mind certainly does not constitute a constitutional violation.

Although he attempts to put the onus on the court to investigate the potential conflict by citing *Holloway*, Vega confuses "conflict" in its generic sense with the term of art "conflict of interest." When an attorney labors under a conflict of interest, he is prevented, by his own self interest or by his interest in another's welfare, from vigorously promoting the welfare of his client. Vega does not allege that his counsel was so burdened.

Rather, he alleges that his counsel gave him advice he did not want to hear. Given that the attorney accepted Vega's decision not to take that advice, the existence of any "conflict" worth mention is dubious. At most, Vega and his attorney had a "conflict" with respect to trial strategy, a problem with no constitutional significance as long as Vega's wishes were respected on ultimate issues such as pleading guilty and testifying.

## VI.

Vega claims he was denied the right to present his own defense under *Faretta v. California*, 422 U.S. 806 (1975), because the trial court refused to investigate his allegations that conflicts existed

13

between himself and Rugeley. He claims it is "well documented before, during and after trial that Petitioner's desired defense was not being pursued." He offers no facts from the record to support this contention, however; it appears his only expression of discontent was a complaint that Rugeley recommended he plead guilty§§a recommendation that was not followed, as the case proceeded to trial. Vega's claim fails, because he did not provide sufficient notice to the court that his desired defense was not being pursued, and because to grant relief we would have to extend the *Faretta* right of self-representation beyond its current boundary as established by the Supreme Court and by this court, creating a new rule of law barred by *Teague*.

Vega relies primarily on *Moreno v. Estelle*, 717 F.2d 171 (5th Cir. 1983), yet in that case we denied relief under facts similar to these. Moreno told the court on the day of trial that he wanted his retained attorney to withdraw from the case because "[s]he isn't helping me. I have asked her to do things for me and everything and I can't get her to do anything. My people pay her and I don't want her." *Id*. at 174. We denied relief because Moreno made no attempt to request that he be able to proceed *pro se* and did not explicitly inform the court of the defenses his attorney had allegedly refused to investigate or present. *Id*. at 174-76.

Furthermore, despite Vega's characterization to the contrary,

14

*Moreno* did not establish that a defendant has a right to force his attorney to present his defenses. At most, we suggested that once the court is notified that counsel refuses to present a defendant's preferred defenses, *Faretta* may require the court to ensure that the defendant knows of his option to represent himself rather than continue to accept the services of his uncooperative attorney. *Id.* at 175. Even there, our statement was too weak to establish a rule of law about which reasonable minds would not disagree: "If the defendant can state particular instances of disagreement . . . as to viable defenses, the defendant's Sixth Amendment rights as defined in *Faretta* are arguably implicated." *Id.*

Moreover, neither this court nor the Supreme Court has held that a defendant may force his attorney to present a defense with which the attorney does not agree or acquire new court-appointed counsel until he finds an attorney who agrees with him. *See Jones v. Barnes*, 463 U.S. at 753 (counsel need not present every non-frivolous argument suggested by the defendant). In *United States v. Moore*, 706 F.2d 538 (5th Cir. 1983), a conscientious district court allowed Moore to replace his court-appointed counsel with different court-appointed counsel three times before finally finding that he had waived his right to counsel. We rejected Moore's contention that he had a right to an attorney who agreed with him and would present his case in the way Moore thought proper: "A defendant is entitled to an attorney who will consider

15

the defendant's views and seek to accommodate all reasonable requests with respect to trial preparation and trial tactics . . . . [He] has no right to an attorney who will docilely do as he is told." *Id*. at 540.

Vega's citation to *Henderson v. Sargent*, 926 F.2d 706, 711 (8th Cir. 1991), for the proposition that the choice not to present a defense is not part of trial strategy is inapposite: In that case, the defendant's attorney failed to *investigate* a promising defense that the defendant did not allege he had suggested but which would have been discovered with proper trial preparation. While choosing among possible defenses is unquestionably part of trial strategy and therefore is subject to considerable deference, the failure properly to investigate possible defenses is part of adequate preparation and receives stricter examination.[5] Even if we were to find that Vega did present sufficient evidence to the trial court that his attorney refused to present his defenses, therefore, *Teague* would bar relief, because a constitutional right to relief under those circumstances has not been established.

## VII.

Vega also argues that the state court erred by refusing his request to represent himself on appeal. A defendant does have a

---

[5] *See Strickland v. Washington*, 466 U.S. 668, 690-91 (1983) (noting that strategic choices based on reasonable investigation are "virtually unchallengeable" and that reasonable professional judgments must support limitations on investigation).

right to submit briefs *pro se* on appeal. *See Myers v. Collins*, 8 F.3d 249, 252 (5th Cir. 1993). Because *Myers* was not decided until after Vega's appeal became final, however, it was not available to the state court when ruling on Vega's request. Pre-*Myers* caselaw did not mandate the result in that case, so *Myers* created a new rule of constitutional law, and we will not grant habeas relief because the state court failed to predict its creation.[6]

Vega claims that the right to self-representation created by *Faretta* dictated that he be allowed to represent himself on appeal. More significantly, the Texas courts have repeatedly held that a criminal defendant has a right to submit *pro se* briefs on appeal, although he has no right to present oral argument. *See, e.g., Webb v. State*, 533 S.W.2d 780 (Tex. Crim. 1976). Texas courts have also held, however, that the right to self-representation on appeal is protected where the defendant is permitted to submit *pro se* briefs and his motions to copy the record and receive notifications are granted. *See Hathorn v. State*, 848 S.W.2d 101, 123 (Tex. Crim. 1993). Vega apparently made no attempt to copy the record or receive other information, but he did submit briefs and motions, some of which were granted, so the right to self-representation as

_____

[6] *See Saffle v. Parks*, 494 U.S. 484, 488 (1990) (the question is "whether a state court considering [the defendant's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution").

developed by the Texas courts was not infringed.

Because the extent and requirements of the right of self-representation on appeal have yet to be established in Texas or in this circuit, a rule holding that the right was violated in these circumstances would be a new rule of constitutional law barred by *Teague*. Even assuming that the right to present *pro se* briefs on appeal is established for *Teague* purposes, we have not established a rule requiring the court to remove the defendant's previous attorney from the case or spontaneously to provide him with the trial record and other documents he might find helpful in writing his briefs. Nor have we established what relief is appropriate where the defendant is permitted to exercise his right only partially. Because the answers to both these questions remain open to debate among reasonable minds, Vega's claim is barred by *Teague*.

## VIII.

Vega's claims of ineffective assistance are easily dismissed. He chastises his counsel for failing to move for a directed verdict at the close of the government's evidence on the ground that his confession was not properly corroborated. He also claims his counsel erred in failing to file a motion for new trial on the basis that the sexual assault evidence should have been barred by collateral estoppel. Vega's claims fail, because his counsel did not err in either of these respects, and because his second claim

is procedurally barred.

Vega suggests that the state failed properly to corroborate his confession because it allegedly did not corroborate it with respect to each element of the "corpus delicti" of capital murder. Texas law appears to require that the state present evidence tending to prove that "a crime was committed" and that in the case of a confession to capital murder, the "corpus delicti" includes the crime making the murder capital, as well as the homicide itself. *See Gribble v. State*, 808 S.W.2d 65, 71 (Tex. Crim. App. 1990). The court stressed, however, that the evidence need not be sufficient to prove any element of the offense, but rather that the evidence must render the corpus delicti more probable than it would be without the evidence. *Id.* at 72. This is a low evidentiary standard, and counsel did not act unreasonably in concluding that the prosecution had met it.

Testimony established that Vega and Linda Mims began a relationship prior to the murder and were married shortly thereafter; that Linda Mims received substantial life insurance proceeds and other moneys from the victim's estate; and that Vega shared the benefits of this income. A reasonable jury certainly could have found these facts sufficient to corroborate Vega's detailed confession.

Vega's claim that counsel should have filed a motion for new trial on grounds of collateral estoppel was not presented in his

19

state habeas petitions. It is therefore unexhausted and procedurally barred under *Nobles v. Johnson*, 127 F.3d 409, 423 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 1845 (1998), and *Emery v. Johnson*, 139 F.3d 191, 196 (5th Cir. 1997). In addition, given the Court of Criminal Appeals's finding that the estoppel issue was without merit, Vega's counsel could hardly have committed an egregious error in failing to make the argument before the trial court.

IX.

At trial, the state failed to disclose that Shirley Barnard, who testified that Vega brutally raped her at gunpoint, had a pending felony indictment. Vega claims the failure to disclose this information deprived him of a fair trial. His claim can succeed, however, only if the prosecution knew or should have known of this evidence, and if it was "material either to guilt or punishment." *Brady v. Maryland*, 373 U.S. 83 (1963).

To prevail on a *Brady* claim, the defendant must demonstrate that (1) the prosecution suppressed evidence; (2) the evidence was favorable to him; and (3) the evidence was "material either to guilt or punishment." *Brady*, 373 U.S. at 87. When prosecutors are unaware of the information, the defendant must show that the prosecution could have obtained the information through "a routine check of FBI and state crime databases, including a witness' state

20

'rap sheet.'" *East v. Scott*, 55 F.3d 996, 1003 (5th Cir. 1995). Vega's argument fails, because the information was not material, exculpatory evidence and because he did not demonstrate that the prosecution knew, or should have known, of it.

The existence of an indictment, as opposed to a conviction, is not generally admissible to impeach.[7] Under Texas law, the existence of the indictment becomes admissible only if the witness, on *direct* examination, misrepresents himself as having "no trouble with the law." *See, e.g. Prescott v. State*, 744 S.W.2d 128, 130-31 (Tex. Crim. App. 1988). Here, the statement was made on cross-examination.

The only other exception, for witnesses whose testimony might be affected by the indictment, does not apply, because Vega has alleged no relationship between that prosecution and his case. *See, e.g., Moore v. Kemp*, 809 F.2d 702 (11th Cir. 1987) (witness received a deal for testifying). Accordingly, the information would not have been admissible and could not have been material information for the defense.

Furthermore, the district court found that Vega had submitted insufficient evidence to support his claim that the prosecution knew or should have known of the pending indictment in another county. Specifically, the court found that Vega had not alleged

---

[7] *See, e.g., Michelson v. United States*, 335 U.S. 469, 482 (1948) (noting that "[o]nly a conviction [] may be inquired about to undermine the trustworthiness of a witness"); *Bell v. State*, 620 S.W.2d 116, 125 (Tex. Crim. App. 1980).

the prosecution knew about the indictment; had not demonstrated that the prosecution could have discovered the indictment with a routine state and FBI criminal history check; and had not produced evidence sufficient to demonstrate conclusively that the person named in the indictment was the same Shirley Barnard who testified at his trial. We accord a presumption of correctness to these findings and see no reason to disturb them. *See* 28 U.S.C. § 2254(d) (1997).

X.

Vega asserts that "because he is innocent of the unadjudicated extraneous aggravated sexual assault and the St. Louis murder alleged by the state during the capital punishment phase his conviction and death sentence need to be vacated." At best, he makes a claim that he is ineligible for the death penalty; the underlying conviction would be unaffected. In addition, his claim of actual innocence fails because he does not raise new evidence demonstrating his innocence of these alleged offenses, and we will not disturb the jury's implicit finding that he committed these crimes.

To support his claim that he is innocent of the sexual assault of Barnard, Vega offers the "rape report" held inadmissible at trial but considered at the evidentiary hearing in August 1994. This evidence was available for trial, but held inadmissible. He

22

also refers to a report, admitted at trial, prepared by criminologist J.R. Urbanovsky for the Texas Department of Public Safety. Finally, he refers to alleged conflicts between Barnard's testimony at his sentencing hearing and the testimony of Lindsey Thomas at the felon-in-possession trial.

This information was available to Vega at trial. To the extent that any of this information could have affected the jury's conclusion regarding the alleged sexual assault, it was either available or excluded as a matter of law. Accordingly, we have no basis for setting aside the verdict.

Vega also alleges that he is innocent of the St. Louis murder to which he had confessed. As in the case of the sexual assault, any evidence on this subject was presumably available at trial; we cannot be certain of this, because Vega fails to specify what evidence he relies upon to prove his assertion. With neither a legal nor a factual basis for considering this contention, we reject it.

Vega cites several cases to support his final claim, none of which offers him support. In *Johnson v. Mississippi*, 486 U.S. 578 (1988), the Court ordered habeas relief where, after the jury had imposed a death sentence, an assault conviction considered by the jury was vacated. This new evidence, the Court held, created doubt about the validity of the sentence. *Id*. at 585. Here, in contrast, no *new* evidence suggests Vega's innocence of the

23

extraneous offenses.

Vega relies on two other inapposite cases: *Townsend v. Burke*, 334 U.S. 736 (1948), which involved a guilty plea obtained through misrepresentation by the prosecution and/or misreading of information by the court, and *Hance v. Zant*, 696 F.2d 940, 950-53 (11th Cir. 1983), which involved prosecutorial misconduct in the nature of inflammatory presentation of the evidence. Neither of these cases is remotely relevant.

Meanwhile, Vega ignores *Lucas v. Johnson*, 132 F.3d 1069, 1074 (5th Cir. 1998), *cert. dismissed*, 1998 U.S. LEXIS 4460 (U.S. July 17, 1998) (No. 97-9463), in which we stated the "extraordinarily high threshold" for newly discovered evidence demonstrating actual innocence, which includes the requirement that the evidence be newly discovered and unknown to the defendant at the time of the trial and the requirement that the evidence be "material, not merely cumulative or impeaching." Vega also alleges baldly that the use of his St. Louis murder confession was "unfair," ignoring this court's repeated holding that such unadjudicated extraneous offenses may be admitted.[8]

Vega has failed to offer sufficient factual and legal justification for any of his claims. We therefore AFFIRM the denial of habeas corpus relief.

---

[8] *See, e.g., Duff-Smith v. Collins*, 973 F.2d 1175, 1184 (5th Cir. 1992); *Williams v. Lynaugh*, 814 F.2d 205, 207-08 (5th Cir. 1987).