CITY OF MANASSA and Pinnacol Assurance, Petitioners/Cross–Respondents

v.

Dale RUFF, Respondent/Cross–Petitioner

and

Industrial Claim Appeals Office of the State of Colorado, Respondent.

No. 09SC612.

Supreme Court of Colorado, En Banc.

June 21, 2010.

Francis A. Koncilja, Koncilja & Associates, P.C., Denver, Colorado, Steven U. Mullens, Steven U. Mullens, P.C., Colorado Springs, Colorado, Attorneys for Respondent/Cross–Petitioner.

William J. Macdonald, Denver, Colorado, Attorney for Amicus Curiae the WCEA.

Harvey D. Flewelling, Pinnacol Assurance, Denver, Colorado, Attorney for Petitioner/Cross–Respondents.

John W. Suthers, Attorney General, A.A. Lee Hegner, Assistant Attorney General, Denver, Colorado, Attorneys for The Industrial Claim Appeals Office.

Justice COATS delivered the Opinion of the Court.

Both the appellant below—claimant Dale Ruff—and the appellees below—the City of Manassa and Pinnacol Assurance—petitioned for review of various aspects of the court of appeals' judgment in this workers' compensation action for disability benefits. *See Ruff v. Indus. Claim Appeals Office*, 218 P.3d 1109 (Colo.App.2009). The Industrial Claim Appeals Office had affirmed the refusal of an administrative law judge to disqualify an independent medical examiner due to an apparent or actual conflict of interest. The court of appeals remanded for reconsideration whether there was an appearance of conflict, relying on its own interpretation of applicable workers' compensation rules of procedure to find that the ALJ gave insufficient consideration to the examiner's relationship with the insurer; but it rejected the claimant's assertion that an independent medical examiner functions in a quasi-judicial capacity, with the same obligations of disclosure and disqualification as are applicable to judicial officers.

Because the court of appeals erred in finding that the ALJ gave inadequate consideration to the relationship between the examiner and Pinnacol Assurance, its order remanding for reconsideration is reversed. Because the independent medical examiner would not be governed by the ethical obligations of judges, even if his determination could reasonably be characterized as a quasi-judicial action, that portion of the court of appeals' judgment declining to impose upon him judicial ethical obligations of disclosure and disqualification is affirmed.

## I.

As the result of a compensable knee injury suffered while in the employ of the City of Manassa, Dale Ruff underwent treatment. When the treating physician declined to find that Ruff had reached maximum medical improvement and disputes arose concerning the conduct of a statutorily prescribed independent medical examination, Ruff applied for a protective order, challenging the designated IME [1] physician's connection with Manassa's insurer, Pinnacol Assurance. An administrative law judge heard the application and, after making written findings of fact and

---

1. The abbreviation "IME" appears in the relevant statute in reference to the independent medical examiner while it appears in the workers' compensation rules in reference to the examination itself.

conclusions of law, denied the requested relief.

As pertinent to the matters at issue here, the record established that the physician chosen according to prescribed statutory and regulatory procedures to perform the independent medical examination was a specialist in physical medicine and rehabilitation, who practiced at a clinic maintained by a group of physicians calling themselves Concentra. Referrals from Concentra physicians accounted for about 60% of his practice, and he therefore declined to perform independent medical examinations on any of their patients.[2] The designated IME physician also contracted with Pinnacol Assurance to participate in a program called SelectNet, a managed care network of about 2,800 physicians who are eligible through their membership in the program to receive referrals in workers' compensation cases from employers insured by Pinnacol. The designated IME physician in this case had been a member of the Select-Net program since its inception approximately seven years earlier, and about 25% of his income was associated with the treatment of injured employees of Pinnacol's insureds.

As a contractual condition of becoming a member of SelectNet, an individual physician, or the business entity employing that physician, must agree to accept between five and ten percent less for services than the maximum amount permitted by the Director of the Division of Workers' Compensation in the Department of Labor and Employment. The contracts themselves also provide that the physician is to exercise his or her independent, professional medical judgment when performing services and in no way condition participation on also performing statutory independent medical examinations or issuing opinions other than according to the physician's medical judgment. The ALJ credited testimony to the effect that Select-Net was established to insure the efficient flow of patients and not as an institution to advocate the interests of Pinnacol.

In addition, evidence at the hearing indicated that the designated IME physician also worked as a medical advisor for Pinnacol, meeting with nurses and adjustors at Pinnacol's offices to discuss medical issues. He was available to perform these services one-half day per month and received $600 for each day worked. As with his SelectNet contract, the designated IME physician's medical advisor contract specifically provided that he was to exercise his independent, professional medical judgment. The ALJ specifically found that no credible evidence had been offered to suggest the insurer had ever attempted, explicitly or implicitly, to condition an IME physician's continued contractual relationship with it on medical opinions it considered favorable.

Based on these facts, the ALJ concluded that the designated IME physician's connections with Pinnacol did not create an apparent or actual conflict of interest, and it denied Ruff's request for a protective order. After the designated physician performed an independent medical examination and determined that Ruff had both achieved maximum medical improvement and suffered permanent impairment, Ruff applied for another hearing. At that hearing, which was conducted by a different ALJ, he again attempted to challenge the qualifications of the IME physician. The ALJ declined to revisit the issue, but noted that Ruff could challenge the physician's opinion by introducing evidence of bias. Ruff chose not to present any evidence opposing the IME physician's opinion, and the ALJ entered an order upholding his conclusions. The Industrial Claim Appeals Office upheld the rulings of both ALJs.

Ruff then appealed to the court of appeals. Ruff argued that the IME physician had been required to disclose his connections with Pinnacol and to disqualify himself from conducting the independent medical examination both by Division of Workers' Compensation Rule of Procedure 11–2(H), 7 Code Colo. Regs. 1101–3, and because the decisions of the IME physician were quasi-judicial actions. Although neither the ALJ nor the ICAO had suggested otherwise, the court of appeals concluded that the disqualification

---

**2.** Quite apart from any financial connection, Workers' Compensation Rule of Procedure 11–2(H) separately disqualifies physicians from serving as an IME physician in cases where someone in their office has treated the claimant. 7 Code Colo. Regs. 1101–3

requirement in Rule 11–2(H) is not limited to conflicts between potential IME physicians and treating physicians, rejecting the narrow interpretation of that rule by another division of the court of appeals, *see Benuishis v. Indus. Claim Appeals Office*, 195 P.3d 1142, 1146–47 (Colo.App.2008). Relying on its broader interpretation of Rule 11–2, the court of appeals held that the ALJ had insufficiently considered the possibility of an appearance of a conflict of interest in this case, and it remanded for reconsideration of that issue. However, it rejected Ruff's assertion of a quasi-judicial action implicating protections beyond those afforded by Rule 11–2.

Both the claimant and the employer/insurer petitioned for review of the court of appeals' decision. We granted the employer/insurer's petition for a writ of certiorari challenging the court of appeals' ruling requiring a remand to address an appearance of a conflict of interest, and we also granted claimant Ruff's cross-petition challenging the court of appeals' ruling that an independent medical examiner does not act in a quasi-judicial capacity.

## II.

In the statutory scheme of the Workers' Compensation Act, §§ 8–40–101 to 8–47–209, C.R.S. (2009), an authorized treating physician is tasked with the initial determination whether an injured employee has reached the point of maximum medical improvement and, if so, with determining the extent to which he has suffered permanent medical impairment. § 8–42–107(8)(b)(I), (c). If either party disputes the conclusions of the treating physician, the statutory scheme provides for the selection of a different physician to conduct an independent medical examination. *Id.;* § 8–42–107.2(2)(b). Further, if the parties cannot agree on a qualified examiner, the statute assigns to the Division of Workers' Compensation the obligation to select three qualified physicians from a revolving list maintained by it, and if more than one physician remains after each party has been given the opportunity to strike, without cause or explanation, one of the three, the statute instructs the Division to select which of the remaining physicians will conduct the examination. § 8–42–107.2(3)(a).

Specifying only the most broadly articulated criteria, the General Assembly has delegated to the Director of the Division both the authority and the obligation to promulgate rules for the implementation of the selection process and the conduct of independent medical examinations. *Id.* In response, the Director has promulgated Division of Workers' Compensation Rule of Procedure 11, entitled simply, "Division Independent Medical Examination," which delineates not only the qualifications required of physicians serving on the Division's medical review panel performing independent medical examinations, but also a number of conditions or rules with which these approved physicians must comply. 7 Code Colo. Regs. 1101–3. Among other things, Rule 11–2(H) prohibits a physician from evaluating a claimant if there is even the appearance of a conflict of interest.[3]

Rather than attempt to more specifically define "conflict of interest" or what is intended by an "appearance" of a conflict, however,

---

**3.** Rule 11–2(H) provides that a physician should:

Not evaluate an IME claimant if the appearance of or an actual conflict of interest exists; a conflict of interest includes, but is not limited to, instances where the physician or someone in the physician's office has treated the claimant. Further, a conflict may be presumed to exist when the IME physician and a physician that previously treated the claimant has a relationship which involves a direct or substantial financial interest. The following guidelines are to assist in determination of conflict or the appearance of a conflict:

(1) direct or substantial financial interest is a substantial interest which is a business ownership interest, a creditor interest in an insolvent business, employment or prospective employment for which negotiations have begun, ownership interest in real or personal property, debtor interest or being an officer or director in a business.

(2) The relationship should be determined at the time the IME is being requested. Relationships in existence before or after the review will have no bearing, unless a direct and substantial interest is present at the time of the IME.

(3) Being members of the same professional association, society or medical group, sharing office space or having practiced together in the past are not the types of relationships that will be considered a conflict or the appearance of a conflict, absent the present existence of a direct or substantial financial interest.

the rule deals expressly only with situations involving the prior treatment of a claimant, making clear that a conflict of interest includes, but is not limited to, these specifically enumerated situations. The rule specifies that a conflict *does* exist where the physician or anyone in the physician's office has treated the claimant and that a conflict may be presumed where the IME physician and a physician who previously treated the claimant have a relationship that involves a direct or substantial financial interest. Rule 11–2(H). It further specifies what is meant by a "direct or substantial financial interest" and offers two cautionary clarifications about the kind of relationships between an IME physician and a previously-treating physician meriting a presumption of conflict within the contemplation of the rule: First, such relationships in existence before or after the independent medical examination are to have no bearing on the matter unless a direct and substantial financial interest exists at the actual time of the independent medical examination, Rule 11–2(H)(2); and second, common membership in professional associations, sharing office space, or having practiced together in the past are not to be considered a conflict or the appearance of a conflict, absent the present existence of a direct or substantial financial interest, Rule 11–2(H)(3).

The statutory scheme itself makes no attempt to address the meaning or effect of a conflict of interest or the appearance of a conflict of interest in the context of Division independent medical examinations. Apart from requiring that all independent medical examinations be conducted in an objective and impartial manner, *see* Rule 11–2(E), and that outside communications be circumscribed to avoid bias, *see* Rule 11–2(K), only Rule 11–2(H) of the Director's rules in any way addresses the question. The issues presented for review are therefore effectively whether the independent medical examiner's relationship with Pinnacol in this case, either because of his participation in the SelectNet program or because of his role as a paid advisor, creates an appearance of conflict within the contemplation of Rule 11–2(H); and, if not, whether the rule promulgated by the Director, permitting a physician to serve as an independent medical examiner under these circumstances, either implicitly conflicts with the Director's statutory mandate to promulgate rules or violates the minimum neutrality requirements of due process imposed on judicial actions.

## III.

■ For various reasons, including both policy considerations and related textual provisions, the court of appeals rejected as too narrow any construction of Rule 11–2(H) limiting application of the term "conflict of interest" to relationships analogous to those given as examples in the rule. In holding, however, that the rule also guards against the appearance of a conflict resulting from an IME physician's "substantial financial interest," as that term is defined at Rule 11–2(H)(1), in a relationship with an insurance carrier, the court of appeals failed to appreciate that such a financial interest is presumed by the rule to involve a conflict only if it exists in a relationship between an IME physician and a physician that previously treated the claimant. While the rule may not limit disqualifying conflicts of interest to relationships like those expressly articulated in the rule, neither does it suggest what other kinds of financial relationships might also create a conflict.

Nor does the phrase "appearance of or an actual conflict of interest," despite the claimant's arguments to the contrary, have a settled, unambiguous meaning requiring disqualification in this case. Rather, the term "conflict of interest" has been described as a term of art, *see, e.g., Stenson v. Lambert,* 504 F.3d 873, 886 (9th Cir.2007); *Vega v. Johnson,* 149 F.3d 354, 360 (5th Cir.1998), reflecting a host of different policy determinations, depending on the context in which it operates, *see Caperton v. A.T. Massey Coal Co.,* —— U.S. ——, ——, 129 S.Ct. 2252, 2259, 173 L.Ed.2d 1208 (2009) (noting that disqualification due to "matters of kinship, personal bias, state policy, remoteness of interest, would seem generally to be matters merely of legislative discretion" (internal quotations omitted)); *cf. People v. Julien,* 47 P.3d 1194, 1197 (Colo.2002) (recognizing an exception to the standard of disqualification in Canon 3 of

Colorado's Code of Judicial Conduct for prior governmental associations, as distinguished from associations in private practice).

Although the outer limits of a disqualifying conflict or the appearance of one are therefore neither clear on the face of the terms themselves nor specified by the rule, it is clear that the rule would presume a conflict, even with regard to a relationship involving a treating physician, only in the event of financial interests not present in this case. *See* Rule 11–2(H)(1). The IME physician's financial interest in acting in an advisory capacity for Pinnacol could, as the ALJ found, hardly be considered substantial, and the physician's participation in the SelectNet program did not create a relationship involving current employment by Pinnacol at all. At most, Pinnacol was potentially positioned to exclude him, in the future, from the list of physicians from which a treating physician could be chosen for injured employees of its insureds; and the presiding ALJ found that the evidence presented at the hearing failed to show that such retaliation for medical judgments had ever occurred or was a realistic likelihood.

■ The presiding ALJ largely relied, however, on positions previously taken by the ICAO, which had been allowed to stand unaltered by the Director's subsequent amendments to the workers' compensation rules. It was already well-settled by written ICAO opinion that the ICAO did not understand either membership in the insurer's SelectNet organization or status as a medical advisor to the insurer, in and of itself, to constitute a disqualifying conflict or create the appearance of one; and the Director's subsequent amendments to Rule 11–2(H) reflecting his interpretations of a conflict or presumptive conflict failed to contradict or even directly address this ICAO construction.[4] As we have noted in the past, "(an) administrative agency's construction of its own regulation is entitled to great weight, especially when, as here, the regulation is promulgated pursuant to an explicit legislative grant of regulatory

authority and the regulation is neither plainly erroneous nor internally inconsistent." *Orsinger Outdoor Adver., Inc. v. Dep't of Highways,* 752 P.2d 55, 66 (Colo.1988); *see also Widder v. Durango Sch. Dist. No. 9–R,* 85 P.3d 518, 528 n. 13 (Colo.2004).

This construction is not inconsistent with other aspects of the rules nor does it exceed or conflict with the Director's statutory mandate. Claimant Ruff's assertions notwithstanding, the General Assembly's use of the term "independent medical examination" implies nothing more than a new examination by a different physician, as distinguished from merely the review of an earlier examination. The Director's determination that membership in SelectNet is not a disqualifying conflict of interest in no way conflicts with this use of the term "independent."

Because the ALJ properly applied the ICAO's longstanding interpretation to conclude that Rule 11–2(H) did not disqualify the designated IME physician in this case, no remand for further consideration of that issue is required.

### IV.

■ The due process requirement of neutrality in adjudicative proceedings entitles a person to an impartial and disinterested decision-maker. *See Marshall v. Jerrico, Inc.,* 446 U.S. 238, 242, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980). When decision-making by non-judicial officers bears sufficient similarities to the adjudicatory function performed by courts, we have characterized it as "quasi-judicial" and similarly subjected it to the basic requirements of due process. *See Cherry Hills Resort Dev. Co. v. City of Cherry Hills Vill.,* 757 P.2d 622, 625–26 (Colo. 1988). While we have often attempted to identify the essential characteristics of adjudicatory proceedings, the decision to denominate any particular non-judicial decision as quasi-judicial has not always been clear. *See, e.g., id.* at 626–28.

---

**4.** Nor has the General Assembly taken any action in its subsequent amendments to the statute under which the rule was promulgated. *Cf. Bd. of County Comm'rs v. Colo. Pub. Utils. Comm'n,* 157 P.3d 1083, 1088–89 (Colo.2007) (legislative inac-
tion to change the interpretation of an agency operating under an express grant of regulatory authority may be presumed to be ratification of that interpretation).

■ The court of appeals rejected the claimant's assertion that an IME physician exercises a quasi-judicial function and, for that reason, also rejected the claimant's argument that the IME physician in this case should have been required to disclose his financial connections with Pinnacol and be disqualified even if it was not required by Rule 11–2(H). We find it unnecessary to determine whether the decision-making function performed by an IME physician can be fairly characterized as quasi-judicial because due process would not have required either disclosure by, or the disqualification of, the IME physician in this case in any event.

■ While Congress and the states are free to impose more rigorous standards for judicial disqualification, the Due Process Clause merely establishes a "constitutional floor," guaranteeing a fair trial in a fair tribunal. *See Bracy v. Gramley*, 520 U.S. 899, 904–905, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997); *see also Caperton*, —— U.S. at ——, 129 S.Ct. at 2267 ("The Due Process Clause demarks only the outer boundaries of judicial disqualifications."). These fundamental protections of neutrality and fairness also apply to non-judicial decision-makers acting in a quasi-judicial capacity. *See Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 617–18, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993). But due process does not also impose upon quasi-judicial decision-makers the more rigorous standards for disqualification, much less other reporting or disclosure requirements, applicable specifically to judicial officers through ethical codes or local rules of procedure. *See Schweiker v. McClure*, 456 U.S. 188, 197 n. 11, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982) (rejecting analogy to judicial canons in the due process context).

■ It is, in fact, the rare situation that objectively poses such an appearance of or actual conflict of interest that due process compels disqualification. *Caperton*, —— U.S. at ——, 129 S.Ct. at 2259, 2267. The ultimate due process question is whether, " 'under a realistic appraisal of psychological tendencies and human weakness,' the interest 'poses such a risk of actual bias or prejudgment that the practice must be forbidden if

the guarantee of due process is to be adequately implemented.' " *Id.* at ——, 129 S.Ct. at 2263 (quoting *Withrow v. Larkin*, 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975)). The Supreme Court, however, has not hesitated to find even pecuniary interests to be simply too small or too attenuated to require disqualification under the Due Process Clause. *See Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 826–27 & n. 3, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986) (noting that "at some point, the biasing influence … will be too remote and insubstantial to violate the constitutional constraints" and rejecting any "rule that a decision rendered by a judge with 'the slightest pecuniary interest' constitutes a violation of the Due Process Clause" (quotations omitted)).

In *Schweiker v. McClure*, which involved federal contracts with insurance carriers to administer Medicare claims, the Supreme Court directly considered the use of current employees, selected unilaterally by the carriers, as hearing officers. 456 U.S. at 189–93, 102 S.Ct. 1665. Although it concluded that these hearing officers were acting in a quasi-judicial capacity, the Court perceived no violation of due process, finding unsupported the "assertion that, for reasons of psychology, institutional loyalty, or carrier coercion, hearing officers would be reluctant to differ with carrier determinations," *id.* at 196 n. 10, 102 S.Ct. 1665, and reasoning that neither the hearing officers nor the insurance carriers had a direct pecuniary interest in the outcomes of the cases because the claims were ultimately to be paid by the government, *id.* at 196, 102 S.Ct. 1665.

Although the carriers had no direct pecuniary interest in the outcomes of particular claims, they were presumably, similar to the IME physician in this case, dependent for maintenance of their contracts upon the very entity responsible for paying the claims approved by their employees. But the Court found it meaningful that, like the IME physician here, who was bound by agency rules and professional medical guidelines, the carriers operated under contracts requiring compliance with standards prescribed by statute and the Secretary. *Id.* at 197, 102 S.Ct. 1665. In the absence of evidence to

support the assertion that these hearing officers would be reluctant to differ with carrier determinations, the Court, much like the ALJ below, concluded that it "simply [had] no reason to doubt that hearing officers will do their best to obey the Secretary's instruction manual." *Id.* at 197 n. 11, 102 S.Ct. 1665.

At least in the absence of evidence of past practices or attempts at intimidation, the mere possibility that an insurance carrier could, if it chose to do so, adversely affect the contractual relationships at issue here simply poses too remote and insubstantial a risk of actual bias or prejudgment by an independent medical examiner to implicate the guarantee of due process. Rule 11–2(H), as interpreted and applied in this case, therefore does not violate due process.

## V.

Because the court of appeals erred in finding that the ALJ gave inadequate consideration to the relationship between the examiner and Pinnacol Assurance, its order remanding for reconsideration is reversed. Because the independent medical examiner would not be governed by the ethical obligations of judges, even if his determination could reasonably be characterized as a quasi-judicial action, the portion of the court of appeals' judgment declining to impose upon him judicial ethical obligations of disclosure and disqualification is affirmed.

Justice MARTINEZ dissents, and Justice BENDER joins in the dissent.

Justice MARTINEZ, dissenting.

I agree with the majority that the phrase "conflict of interest" is a term of art that must be understood in light of its use and the context to which it is applied. *See* maj. op. at 1055–56. However, the majority reads Rule 11–2(H) ("the Rule") far too narrowly and divorces the Rule both from those statutes it has been crafted to implement and from the other administrative rules with which it operates. In my view, the IME physician's substantial financial relationship with the claimant's insurer in this case—amounting to 25% of his business and totaling over $100,000—is sufficient to establish an apparent conflict of interest. Because I believe that the majority's analysis unnecessarily narrows normal conceptions of conflicts of interest and renders parts of the legislature's enactment without meaningful effect, I respectfully dissent.

After discovering that the IME physician in this case received roughly 25% of his income from Pinnacol-paid cases and had an ongoing consulting position with the insurance company, Ruff moved to disqualify him—not as laboring under an *actual* conflict of interest—but rather as "axiomatically" barred due to an *apparent* conflict of interest. Reviewing the motion, the ALJ noted that the IME physician "credibly testified" to his ability to dispassionately review Ruff's claim in spite of his relationship with the insurance provider, and so denied Ruff's motion.

The court of appeals' decision to remand the case to the ALJ for a determination as to the IME physician's apparent conflict was the only rational one: the physician's credible testimony as to his own actual neutrality cannot by itself overcome an alleged apparent conflict. Rather, apparent conflicts should be measured, at least in part, by objective indicia chosen not only to protect against biased medical examinations, but also to establish a process for workers' compensation determinations that seems fair to those that will be governed by it, and that helps "maintain the public's confidence in the integrity" of the process. *Crandon v. United States,* 494 U.S. 152, 165, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990) (describing the value of regulating apparent and potential conflicts of interest even where no harm or bias has resulted).[1] Throughout its opinion, however, the majority's focus rests squarely on actual conflicts of interest; the majority only peripherally mentions Rule 11–2(H)'s proscription of apparent conflicts. As such,

---

1. Indeed, even when considering the "constitutional floor" established by the Due Process Clause, maj. op. at 1057, assessments of *actual* bias are based on objective inquiries rather than findings concerning the subjective mental state of a challenged tribunal officer. *See Caperton v. A.T. Massey Coal Co.,* —— U.S. ——, ——, 129 S.Ct. 2252, 2262, 173 L.Ed.2d 1208 (2009).

the majority subtly recasts the dispute as a challenge to the IME physician's ability to be actually independent and, in so doing, the majority reduces the Rule's contemplation of apparent conflicts to little more than a rhetorical flourish.

Ultimately, the majority's decision makes little sense in light of the statutory scheme or the surrounding structure of administrative rules. For example, pursuant to its authority under section 8–42–101(3.5)(a)(II), C.R.S. (2009), the director promulgated a suite of "medical treatment guidelines and utilization standards," including rules addressing conflict issues not only in the context of independent medical examiners, Rule 11–2(H), but concerning utilization review committee members as well. *See* Division of Workers' Compensation Rule of Procedure 10–5(E), 7 Code Colo. Regs. 1101–3; *see also Colo. Comp. Ins. Auth. v. Nofio,* 886 P.2d 714, 716–17 (Colo.1994) (discussing medical utilization review). The two rules' descriptions of cognizable conflicts are nearly identical, *compare* Rule 10–5(E)(1)–(3) *with* Rule 11–2(H)(1)–(3), and both explicitly state they are to be read only as guidelines—not as limiting language—for the assessment of alleged conflicts. Despite their similarities, though, the two rules have one important difference: Rule 11–2(H) considers it inappropriate for independent medical examiners to labor under apparent conflicts, while Rule 10–5(E) only concerns itself with the actual conflicts of utilization committee members.

The imposition of stricter conflict guidelines for IME physicians over utilization committee members both makes sense as a practical matter and is supported by pertinent statutory provisions. Utilization committee members review medical procedures and make recommendations based on a majority vote of a multi-member panel, *see, e.g.,* Rule 10–6 (Composition of Utilization Review Committees), while the recommendation of a single medical examiner de facto resolves a maximum medical improvement dispute. The findings of an IME physician are all but dispositive as they can be overcome only by clear and convincing evidence. § 8–42–107(8)(b)(III), (c), C.R.S. (2009). As such, it is reasonable to treat conflict concerns differently in the different contexts. More than reasonable, though, this distinction is supported by the respective statutes. The statutory scheme requires medical examiners to be "independent," while no such mandate is made for utilization committee members. Additionally, the General Assembly took pains to lay out a process for their selection that will appear balanced and fair. § 8–42–107.2, C.R.S. (2009).

By focusing on whether the IME physician in this case had been or was reasonably likely to be biased by his relationship with Pinnacol, *see* maj. op. at 1055–56, 1057–58, the majority leaves hollow and meaningless the Rule's mention of apparent conflicts and so removes all means by which alleged conflicts under the two rules would be analyzed differently. Perhaps even more remarkably, the majority claims that " 'independent medical examination' implies nothing more than a new examination by a different physician." Maj. op. at 1056. Such a conception reduces the independent medical exam to but a "second opinion" and is woefully inconsistent with the statutory framework that takes care to ensure that the election of an IME physician preserves the physician's independence. *Cf.* § 8–42–107.2. As such, the majority's overarching emphasis on actual conflicts of interest here sidesteps the issues presented to us for review and ultimately lies at odds with the statutory scheme itself.

Even putting aside its framing of the issues, though, the majority's construction of Rule 11–2(H) in many ways contravenes a natural reading of the Rule. At every turn, Rule 11–2(H) indicates that its text is intended as illustrative and is meant to guide assessments of conflicts rather than to constrain them. The Rule notes that a conflict "includes, but is not limited to" instances where the physician or someone in her office has treated the claimant and "further" that a conflict may be presumed when the IME physician has a direct or substantial financial relationship with a physician that previously treated the claimant. Thereafter, the Rule delineates "guidelines" to "assist in determination of conflict or appearance of a conflict."

The Rule's language notwithstanding, Pinnacol argues strenuously that the Rule con-

templates only those financial conflicts as between an IME physician and the previously-treating physician. Although the majority stops short of firmly drawing that line, it leaves little room for other conflicts to exist at the Rule's "outer limits." Maj. op. at 1055–56. The majority describes the Rule as dealing expressly only with situations involving the prior treatment of a claimant, and so construes the Rule's guidelines as but "cautionary clarifications" regarding such situations. Maj. op. at 1054–55. Even more tellingly, the majority notes that the Rule does not "suggest" what other kinds of financial relationships might also create a conflict and so concludes that the Rule does not extend to the factual situation at hand. Maj. op. at 1055.

Such a reading renders the phrase "conflict of interest" wholly unrecognizable. Even the IME physician's own testimony before the ALJ in this case is in tension with the majority's construction. As the majority itself notes, see maj. op. at 1052–53, the IME physician indicated there that he would voluntarily disqualify himself in cases where the prior treating physician was employed by Concentra, because he received roughly 60% of his business from Concentra referrals and would fear angering a major source of referrals by disagreeing with a treating physician. From his comments, it seems the IME physician would—I think rightly—consider a substantial financial relationship with the previous physician's *employer* to create a conflict of interest, even if he had no relationship whatsoever with the treating physician himself. Despite the physician's cogent exposition of the very real concern that indirect financial ties with parties other than the prior treating physician may inject bias into a medical assessment, the majority hints that it would not consider such relationships to be problematic under its construction of the Rule. The majority's primary concern is the job titles of those persons in the alleged conflict rather than whether the nature of their relationship poses a threat to the integrity of the proceedings.[2] Even reading the majority's opinion generously as allowing for some other limited circumstances in which an IME physician's financial relationships with parties other than the prior treating physician could be grounds for a disqualifying conflict, the majority fails to explain why a 25% share of a physician's business—totaling over $100,000—should be considered "hardly substantial" here, maj. op. at 1055–56, especially when the IME physician himself would consider a 60% share to create an actual—not just apparent—conflict of interest.

Finally, because I read the statute's mandate that an IME physician be "independent" to establish statutory due process protections beyond those found in the Constitution's Due Process Clause, I believe it is unnecessary to resort to sweeping due process principles as the majority does. *See Caperton,* —— U.S. at ——, 129 S.Ct. at 2267. Rather, I would hold that the Rule sets forth guidelines for the normal, objective assessment of apparent conflicts of interest. The ALJ, like the majority in its opinion, gave no meaningful effect to the Rule's prohibition against apparent conflicts or the statute's mandate that an IME physician be independent. As such, I would affirm the court of appeals' opinion.

For the foregoing reasons, I respectfully dissent.

I am authorized to state that Justice BENDER joins in this dissent.

---

**2.** Contrary to the majority's assertions, I would hold that any interpretation of Rule 11–2(H) that obliterates conflicts beyond those between the IME physician and the prior treating physician are plainly erroneous and entitled to no weight in our review. *Cf. Jiminez v. ICAO,* 51 P.3d 1090, 1093 (Colo.App.2002).