COLORADO COURT OF APPEALS                                    **2017COA47**

Court of Appeals No. 16CA0920
City and County of Denver District Court No. 15CV32427
Honorable Shelley I. Gilman, Judge

Arthur Keith Whitelaw, III; John DeRungs; Katherine K. McCrimmon; Laura
Pitmon; Denise Sigon, f/k/a Denise L. Sager; Alan Singer; and Rita Singer,

Plaintiffs-Appellants,

v.

Denver City Council, including the individual Council members in their official
capacity, Albus Brooks, Charlie Brown, Jeanne Faatz, Christopher Herndon,
Robin Kniech, Peggy Lehmann, Paul López, Judy H. Montero, Chris Nevitt,
Debbie Ortega, Jeanne Robb, Susan Shepherd, and Mary Beth Susman;
Manager of Community Planning and Development, Brad Buchanan, in his
official capacity; Denver Planning Board, including the individual Board
members in their official capacity, Andy Baldyga, Jim Bershof, Shannon
Gifford, Renee Martinez-Stone, Brittney Morris Saunders, Joel Noble, Susan
Pearce, Arleen Taniwaki, Julie Underdahl, Frank Schultz, and Chris Smith;
City and County of Denver; and Cedar Metropolitan LLC,

Defendants-Appellees.

_____

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE TAUBMAN
Navarro and Plank*, JJ., concur

Announced April 6, 2017
_____

Gibson, Dunn & Crutcher LLP, Gregory J. Kerwin, Denver, Colorado, for
Plaintiffs-Appellants

Kristin M. Bronson, Denver City Attorney, Nathan J. Lucero, Assistant City
Attorney, Tracy A. Davis, Assistant City Attorney, Denver, Colorado, for
Defendants-Appellees Denver City Council, including the individual Council
members in their official capacity, Albus Brooks, Charlie Brown, Jeanne Faatz,
Christopher Herndon, Robin Kniech, Peggy Lehmann, Paul López, Judy H.

Montero, Chris Nevitt, Debbie Ortega, Jeanne Robb, Susan Shepherd, and Mary Beth Susman; Manager of Community Planning and Development, Brad Buchanan, in his official capacity; Denver Planning Board, including the individual Board members in their official capacity, Andy Baldyga, Jim Bershof, Shannon Gifford, Renee Martinez-Stone, Brittney Morris Saunders, Joel Noble, Susan Pearce, Arleen Taniwaki, Julie Underdahl, Frank Schultz, and Chris Smith; and City and County of Denver

Foster Graham Milstein & Calisher, LLP, Chip G. Schoneberger, Katherine Roush, Denver, Colorado, for Defendant-Appellee Cedar Metropolitan LLC

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2016.

¶ 1     In this C.R.C.P. 106(a)(4) action, plaintiffs, Arthur Keith Whitelaw, III; John DeRungs; Katherine K. McCrimmon; Laura Pitmon; Denise Sigon, formerly known as Denise L. Sager; Alan Singer; and Rita Singer (the neighbors), seek judicial review of the rezoning decision of defendant Denver City Council.[1] We affirm.

## I.     Background

¶ 2     Defendant Cedar Metropolitan LLC (Cedar) applied to rezone the 2.3-acre "Mt. Gilead Parcel" located at 195 S. Monaco Parkway, on the southeast corner of Crestmoor Park in east Denver (the parcel). To build an age-targeted[2] apartment complex on the site, Cedar sought to tear down a blighted church on the site and rezone

---

[1] The neighbors' notice of appeal also names as defendants the individual Council members in their official capacity, Albus Brooks, Charlie Brown, Jeanne Faatz, Christopher Herndon, Robin Kniech, Peggy Lehmann, Paul López, Judy H. Montero, Chris Nevitt, Debbie Ortega, Jeanne Robb, Susan Shepherd, and Mary Beth Susman; the Manager of Community Planning and Development (Brad Buchanan, in his official capacity); the Denver Planning Board (including the individual members in their official capacity, Andy Baldyga, Jim Bershof, Shannon Gifford, Renee Martinez-Stone, Brittney Morris Saunders, Joel Noble, Susan Pearce, Arleen Taniwaki, Julie Underdahl, Frank Schultz, and Chris Smith); and the City and County of Denver.
[2] According to the June 2015 hearing record, Cedar applied to rezone the site in October 2014 to build this "age-targeted" housing. "Age-targeted" is a marketing term developers use to describe residents who are empty nesters or aged forty-five and older.

1

the parcel from E-SU-DX (single-family home) to S-MU-3 (allowing three-story apartment buildings).

¶ 3     The neighbors are property owners who live in the Crestmoor Park neighborhood located near the parcel.  They challenged efforts by Cedar to rezone the parcel.  They asserted that rezoning would harm their property values, create traffic and parking problems, cause hazards to pedestrians, and degrade the character of the surrounding neighborhood.  In June 2015, after an eight-hour hearing where the City Council heard comments from the public both in support of and against the rezoning, the City Council changed the zoning designation to S-MU-3.

¶ 4     The neighbors then challenged the rezoning in district court.  Their complaint asserted a claim for judicial review under C.R.C.P. 106(a)(4) of the decisions of the City Council, the Denver Planning Board, and the Community Planning and Development Department (CPD) relating to the rezoning of the parcel.  The neighbors also asserted a claim for declaratory relief concerning (a) the City's policy and practice of not considering traffic and parking impacts in the rezoning process; (b) the City's implementation of the Protest Procedure in the Denver City Charter and Denver Zoning Code

(DZC); (c) the conflicts created by campaign contributions to Council members from Cedar's lobbyist seeking Council approval of Cedar's proposed zoning change; and (d) whether the rezoning constituted unlawful spot zoning. The district court rejected all of the neighbors' claims.

¶ 5 On appeal, the neighbors challenge the City Council's approval of Cedar's requested rezoning under C.R.C.P. 106(a)(4). They assert various claims, including violation of their right to due process. While the neighbors mention in their briefs an appeal of the court's denial of their claim for declaratory relief, we do not address it, since the neighbors have only raised such a claim in a cursory manner; indeed they did not cite C.R.C.P. 57 in their appellate briefs. *See People v. Gingles*, 2014 COA 163, ¶ 29, 350 P.3d 968, 973 (citing *People v. Wallin*, 167 P.3d 183, 187 (Colo. App. 2007)) (declining to address arguments presented in a perfunctory or conclusory manner).

## II.   Due Process Violation

¶ 6 The neighbors contend that the City Council violated their rights to due process in five ways. We disagree and address each contention in turn.

3

## A. Standard of Review and Preservation

¶ 7    In a Rule 106(a)(4) proceeding, our review is limited to whether the governmental body's decision was an abuse of discretion or was made in excess of its jurisdiction, based on the evidence in the record before that body. C.R.C.P. 106(a)(4)(I); *Verrier v. Colo. Dep't of Corr.*, 77 P.3d 875, 879 (Colo. App. 2003); *see also Alpenhof, LLC v. City of Ouray*, 2013 COA 9, ¶ 9, 297 P.3d 1052, 1055. An agency's misinterpretation or misapplication of governing law may constitute an alternative ground for finding an abuse of discretion under C.R.C.P. 106(a)(4). *See Roalstad v. City of Lafayette*, 2015 COA ¶ 13, 363 P.3d 790, 793.

¶ 8    Because an appellate court sits in the same position as the district court when reviewing an agency's decision under C.R.C.P. 106(a)(4), appellate review of the district court's decision is de novo. *Alward v. Golder*, 148 P.3d 424, 428 (Colo. App. 2006) (citing *Thomas v. Colo. Dep't of Corr.*, 117 P.3d 7 (Colo. App. 2004)). The rezoning of an individual parcel is a quasi-judicial decision by the City Council. *Cherry Hills Resort Dev. Co. v. City of Cherry Hills Village*, 757 P.2d 622, 625-26 (Colo. 1988). Quasi-judicial decision-making requires notice and an opportunity to be heard as a matter

4

of "fundamental fairness to those persons whose protected interests are likely to be affected by the governmental decision." *Id.* at 626. We affirm a rezoning decision unless the governmental entity exceeded its jurisdiction or abused its discretion, which occurs if the body misapplied the law or no competent evidence supports its decision. *Alpenhof*, ¶ 9, 297 P.3d at 1055. "No competent evidence" means that the decision is "so devoid of evidentiary support that it can only be explained as an arbitrary and capricious exercise of authority." *Canyon Area Residents v. Bd. of Cty. Comm'rs*, 172 P.3d 905, 907 (Colo. App. 2006) (quoting *Bd. of Cty. Comm'rs v. O'Dell*, 920 P.2d 48, 50 (Colo. 1996)). While interpretation of a city code is reviewed de novo, interpretations of the code by the governmental entity charged with administering it deserve deference if they are consistent with the drafters' overall intent. *Alpenhof*, ¶ 10, 297 P.3d at 1055.

¶ 9 The neighbors preserved all of the issues below by raising them in their Rule 106 petition.

### B.    Ex Parte Communications

¶ 10 The neighbors assert that Sean Maley, a lobbyist for Cedar, communicated with Council member Mary Beth Susman, the

5

Council member in whose district the parcel lies, through her private e-mail account and by phone prior to the public hearing. They also suggest that Maley had similar communications with other Council members. The neighbors contend that the failure to disclose these communications to the public prior to the hearing deprived them of their due process rights since they did not receive notice and opportunity to rebut the information on which the Council may have impermissibly relied in making its determination.[3]

¶ 11    Acting as quasi-judicial decision-makers, city council members are entitled to a "presumption of integrity, honesty, and impartiality." *Soon Yee Scott v. City of Englewood*, 672 P.2d 225,

---

[3] The neighbors assert that if we do not vacate the rezoning on the basis of the ex parte communications, we should reverse and remand because of the district court's erroneous discovery rulings, which blocked the neighbors from obtaining documents and deposition testimony about the alleged prejudicial effect of these communications. However, "[r]eview of a governmental body's decision pursuant to Rule 106(a)(4) requires an appellate court to review the decision of the governmental body itself rather than the district court's determination regarding the governmental body's decision." *IBC Denver II, LLC v. City of Wheat Ridge*, 183 P.3d 714, 717 (Colo. App. 2008) (citation omitted). Accordingly, our review is based solely on the record that was before the City Council. A remand for further discovery is not permitted under a C.R.C.P. 106 claim if that evidence was not a part of the record in the first place.

6

227 (Colo. App. 1983). Thus, while it is true that parties to an administrative hearing should have the opportunity to be confronted with all facts that influence the disposition of a case, there must be substantial prejudice that is shown to invalidate an agency action in order to rebut this presumption. *L.G. Everist, Inc. v. Water Quality Control Comm'n of Colo. Dep't of Health*, 714 P.2d 1349, 1352 (Colo. App. 1986) (citing *Mobile Pre-Mix Transit, Inc. v. Pub. Utils. Comm'n*, 618 P.2d 663 (Colo. 1980)).

¶ 12    Here, despite extensive evidence consisting of approximately fifty pages of e-mails that form the basis of their allegation of prejudice, the neighbors pointed to no evidence of e-mails or telephone conversations that had a substantial prejudicial impact on the outcome of the proceeding. In fact, Council member Susman ultimately voted against the rezoning. Nothing in the record suggests that she disclosed any prejudicial communications to other Council members who voted in favor of rezoning, either. Further, the district court, in its detailed and thorough order, noted that the record established that Council member Susman reiterated in her e-mails to several people, including one to former Council member Susan Barnes-Gelt, that she had a duty to remain

7

impartial. Thus, the record shows that, despite the neighbors'

claims that Susman encouraged others to vote in favor of the

rezoning while she voted against it,[4] the neighbors have not

rebutted the presumption that Susman acted impartially. The

neighbors' claims, based solely on the hearsay e-mail from Barnes-

Gelt, are insufficient to rebut the presumption.

¶ 13    Therefore, we conclude that because the neighbors have not

overcome the presumption of integrity, honesty, and impartiality,

and have shown no prejudice from the communications, the City

Council did not violate their due process rights. *See Soon Yee Scott*,

672 P.2d at 227.

### C.    The Planning Board Conflict of Interest

¶ 14    The neighbors also assert that their due process rights were

violated due to the involvement of Jim Bershof, Cedar's architect

and a member of the City's Planning Board, in the application

process. The City's Planning Board recommended that the City

---

[4] The neighbors cite to an e-mail from Barnes-Gelt that said she heard that Council member Susman was not supporting the rezoning, but had been letting others know that she would be comfortable if it was approved. Besides the fact that this information is hearsay within hearsay, in her response, Council member Susman clearly dismissed such gossip and recognized her duty to be impartial.

8

Council approve the rezoning application. Bershof submitted the application to the Board, but he did not attend or vote on the rezoning. The neighbors claim that their due process rights were violated because Bershof's connection to the Board imbued every member with an inherent conflict of interest when they voted, as quasi-judges, on their own colleague's rezoning request. For the reasons discussed below, we do not address this claim.

¶ 15 Denver Revised Municipal Code (D.R.M.C.) section 12-44 specifically provides:

> Any planning board member having a financial interest in any measure before the board shall not participate in the consideration of such measure as a board member nor vote on such measure, but the board shall have authority to grant a hearing to such member in the capacity of or as an applicant, subject to the board's bylaws and rules and regulations governing such hearings.

Bershof complied with this requirement by not attending the Planning Board meeting or otherwise participating in the decision. Regardless, whether section 12-44 creates or allows an impermissible conflict of interest among the Planning Board members is not subject to judicial review under Rule 106, which

9

limits our review to decisions of governmental bodies or officers "exercising judicial or quasi-judicial functions."  C.R.C.P. 106(a)(4).

¶ 16    According to the zoning code, Planning Board members only make recommendations to the City Council on rezoning applications.  *See* DZC § 12.4.10.4(E).  A division of this court considered a similar issue under the Cherry Hills Municipal Code in *Buck v. Park*, 839 P.2d 498, 500 (Colo. App. 1992).  The plaintiffs in that case sought judicial review under C.R.C.P. 106(a)(4) of a recommendation by the Cherry Hills Planning and Zoning Commission to deny their rezoning application.  *Id.* at 499.  The division held their claim unreviewable because the Cherry Hills Municipal Code permitted the Commission only to make a recommendation, while the final decision was reserved for the City Council.  *Id.* at 500.

¶ 17    Likewise, we conclude that the Planning Board's recommendation on a proposed rezoning application is not appealable because it is not a "final decision" reviewable under C.R.C.P. 106(a)(4).  According to the DZC, a decision by the City Council on a rezoning decision may be appealed to the district court.  § 12.4.11.5.  Nowhere does the DZC refer to the Planning

10

Board's recommendation on a proposed rezoning amendment as a "decision." Rather, the code refers to a "recommendation" by the Planning Board and a "[f]inal [d]ecision" by the City Council. § 12.4.11.3. The Planning Board's recommendation is only an intermediate step in the review process, which concludes with the City Council's decision to approve or deny the proposed rezoning amendment. The DZC explicitly states that only the City Council is responsible for "final action" on a proposed rezoning amendment. § 12.2.1.2. Therefore, Rule 106(a)(4) affords no jurisdictional basis to review Planning Board recommendations.

¶ 18    The neighbors contend that, regardless, the Planning Board's recommendation is an essential step of the process warranting review under Rule 106(a)(4). However, our review is still limited to decisions of governmental bodies or officers "exercising judicial or quasi-judicial functions." C.R.C.P. 106(a)(4). While the neighbors argue that the Planning Board could not function as a neutral decision-maker due to Bershof's participation, we conclude, by language of the DZC, that the Planning Board does not sit as a quasi-judicial decision-maker, nor are its recommendations an exercise of a quasi-judicial function. Its recommendation is only

11

that, while the City Council holds the power to make a final decision on the recommendation of the Planning Board.

¶ 19     Accordingly, we do not review this claim.

### D.     Irrelevant Political Factors

¶ 20     The neighbors next argue that their due process rights were violated because certain City Council members' comments at the public hearing reflected "flawed quasi-judicial decision making" and showed that they "relied on irrelevant factors and information outside of the hearing record" in arriving at their decisions.

¶ 21     Quasi-judicial decision-makers are required to base their decisions on relevant review criteria and the evidence in the administrative record.  *See, e.g., Snyder v. City of Lakewood,* 189 Colo. 421, 425, 542 P.2d 371, 374 (1975), *overruled on other grounds by Margolis v. Dist. Court,* 638 P.2d 297, 299 (Colo. 1981). Again, the City Council's decision must be upheld unless no competent evidence in the record supports it.  *City & Cty. of Denver v. Bd. of Adjustment,* 55 P.3d 252, 254 (Colo. App. 2002).

¶ 22     As we discuss in Part III below, the neighbors fail to demonstrate a lack of competent evidence supporting the City Council's ultimate decision or that any individual Council member

12

relied on factual information outside the hearing record or ignored the record evidence in casting his or her vote. Rather, the record shows that the City Council's approval of the proposed rezoning was consistent with the City's adopted plans, as required by the DZC, and the Council considered the public health, safety, and general welfare.

¶ 23 The neighbors even acknowledge that, in explaining their votes in favor of rezoning, City Council members relied on the provisions of the adopted plans. For example, Council member Chris Nevitt said that the adopted plans encouraged preservation of old neighborhoods and struck a balance between preservation and prevention of sprawl. He also noted that, consistent with the adopted plans, the proposed new housing complex was along a transit route. Council member Albus Brooks also discussed whether the "existing site" reflected "the context."

¶ 24 We therefore conclude that competent evidence in the record supports the City Council's rezoning decision such that the neighbors have failed to rebut the presumption of integrity, honesty, and impartiality in favor of the City Council's decision.

E.    The Protest Petition Procedure

¶ 25    The neighbors next assert that their due process rights were violated because the City Council stepped outside of its neutral, quasi-judicial role and supported Cedar by improperly applying the protest petition procedure of the Denver City Charter.

¶ 26    Section 3.2.9(E) of the Denver Charter outlines the protest petition procedure.  If opponents of a City Council action gather signatures from property owners representing twenty percent or more of the land area within 200 feet of the perimeter of a proposed rezoning, then the rezoning must pass the City Council by a super-majority (ten members).  In calculating the land area, the City included City-owned land, including the portion of Crestmoor Park within the 200-foot protest petition area.

¶ 27    Opponents gathered only enough signatures to represent seventeen percent of the perimeter zone and thus failed to trigger the requirement of a super-majority.  The rezoning passed by an eight to four vote.  The neighbors argue that the City improperly applied the protest procedure by including the park land but not allowing any procedure for residents to obtain petition signatures from the City.  The neighbors request that we hold that the City

14

must either (a) exclude City-owned park land from the protest petition area or (b) create a procedure to allow citizens to obtain protest petition signatures from City representatives for City-owned park land.

¶ 28   Cedar and the City Council respond that the City Council properly followed the holding in *Burns v. City Council*, 759 P.2d 748 (Colo. App. 1988), in which a division of this court interpreted charter section 3.2.9(E) to require inclusion of all City-owned land in the calculation of the 200-foot protest petition area.

¶ 29   We agree with Cedar and the City Council and conclude that *Burns* properly interpreted this ordinance to include all land in the 200-foot area irrespective of ownership.

¶ 30   In *Burns*, a division of this court held that "[t]he charter and ordinance provisions that the protest area be defined as 'the area to a distance of 200 feet from the perimeter of the area proposed for change' are clear, plain, and unambiguous; accordingly, they must be applied as written." 759 P.2d at 750. The division further held that, as a result, the City's inclusion of City-owned streets in its computation of the protest area was neither arbitrary nor

capricious; consequently, it was not erroneous.  *Id.* (citing *Pfaff v. City of Lakewood*, 712 P.2d 1041 (Colo. App. 1985)).

¶ 31    In calculating the land area here, the City Council likewise included all City-owned land within the 200-foot protest petition area.  Because this calculation was in accordance with the plain language of charter section 3.2.9(E), as interpreted in *Burns*, this method of computation was not arbitrary or capricious.

¶ 32    As for the neighbors' second claim requesting that we either create a procedure to allow citizens to obtain signatures from City representatives or compel the City to create such a procedure, we have no authority to do so.  Further, the record reflects that the neighbors contacted the director of the City's Parks Department and requested that she sign the petition but that she had "refused to take sides on the matter."  Her refusal to sign did not effectively foreclose the neighbors' opportunity to meet the requirements of the protest petition procedure.

¶ 33    In conclusion, the City did not err in its calculation of the protest petition area.

## F.   Campaign Contributions

¶ 34   The neighbors next contend that their due process rights were violated because some Council members received "substantial" political contributions from lobbyists and, therefore, were biased in the rezoning vote.  They assert that, based on *City of Manassa v. Ruff*, 235 P.3d 1051 (Colo. 2010), and *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009), "[t]hese fundamental protections of neutrality and fairness also apply to non-judicial decision-makers acting in a quasi-judicial capacity," *Manassa*, 235 P.3d at 1057, and therefore, quasi-judicial decision-makers should be held to the same judicial canons as judges.

¶ 35   However, we conclude, as did the district court, that our review of this proceeding under Rule 106(a)(4) is limited to the record that was before the City Council.  Because evidence of the contributions was not in the record before the Council and the neighbors first raised this issue in the district court, we may not review it.  Further, the neighbors did not address this issue on appeal in connection with their declaratory relief claim.  We thus do not review this challenge to the Council members' roles as neutral,

17

quasi-judicial decision-makers because it is based on facts outside the record of the Rule 106 proceeding.

### III. Compliance With the Zoning Code

¶ 36 The neighbors next contend that we must vacate the rezoning decision because, as a matter of law, the rezoning does not comply with the City's zoning ordinance; specifically, the rezoning is not consistent with the City's adopted plans, no specific circumstances justified the rezoning, and the rezoning fails to further the public health, safety, and general welfare. We disagree.

¶ 37 In this case, the City Council must abide by the DZC, which requires that a proposed rezoning be consistent with the City's adopted plans and further the public health, safety, and general welfare. § 12.4.10.7. There must also be specific "[j]ustifying [c]ircumstances" warranting the rezoning. § 12.4.10.8.

¶ 38 The City Council approved rezoning of the parcel as S-MU-3. The parcel is bounded on the east by South Monaco Parkway. There are multi-family apartments situated across the street from the parcel. The parcel is bounded on the south by a day-care establishment and one single-family home, on the north by rowhomes, a City-owned parks maintenance facility and portions of

18

Crestmoor Park, and on the west by rowhomes and other portions of Crestmoor Park. The Crestmoor Park neighborhood lies to the west and south of Crestmoor Park and is zoned as single family. South Monaco Parkway is a "residential arterial street."

¶ 39    In its February 2015 Staff Report and Recommendation submitted to the City Council, the CPD found that the rezoning was consistent with many of the strategies of the Denver Comprehensive Plan 2000. Specifically, it found that the rezoning met the "Environmental Sustainability Strategy . . . by promoting infill development within walking distance of a mixed use area (Lowry Town Center) and commercial arterial (Alameda)." The CPD also noted that the proposed "three-story multi-unit residential development" was "consistent with similar multi-unit residential development across South Monaco Parkway while providing a height limit of three stories, compatible with nearby zone districts for single-unit residential development."

¶ 40    The CPD, moreover, found that the proposed rezoning met the "Neighborhood Strategy . . . by providing the opportunity for a range of housing types in this neighborhood." Finally, the CPD found that the parcel was a reinvestment area within an area of stability

19

because it "currently has a deteriorating and poorly maintained church." It indicated that the proposed rezoning would "encourage reinvestment into the neighborhood, and provide[] a buffer between single-unit residential development within the Crestmoor neighborhood to the east and the additional development and activity along South Monaco Parkway." The CPD added that the proposed rezoning would further the public health, safety, and general welfare of the City and encourage reinvestment in the area by "removing a structure on site that has been poorly maintained for many years." The CPD reiterated its findings at the June 2015 hearing before the City Council.

## A. Standard of Review

¶ 41 The same standard of review outlined in Part II.A applies to this claim.

## B. Applicable Law

¶ 42 Under the DZC, the City Council may approve a rezoning proposal that the City Attorney has determined is not a legislative rezoning if the proposed rezoning complies with the following criteria: (1) the proposed rezoning is consistent with the City's adopted plans; (2) the proposed rezoning results in uniformity of

20

district regulations and restrictions; (3) the proposed rezoning furthers the public health, safety, and general welfare; (4) circumstances justify the proposed rezoning; and (5) the proposed rezoning is consistent with the description of the applicable neighborhood context and the stated purpose and intent of the proposed Zone District.  §§ 12.4.10.7-.8.  A justifying circumstance exists when "[t]he land or its surrounding environs has changed or is changing to such a degree that it is in the public interest to encourage a redevelopment of the area or to recognize the changed character of the area."  § 12.4.10.8(A)(4).  Only two planning guidelines apply to the parcel in this case: the Denver Comprehensive Plan 2000 (2000), https://perma.cc/QUU7-VGUL (Plan), and Blueprint Denver (2002), https://perma.cc/SE82-M676.

¶ 43     The DZC also notes, "The Suburban Neighborhood Context is characterized by single-unit and multi-unit residential, commercial strips and centers, and office parks. . . .  Multi-unit residential and commercial uses are primarily located along arterial and collector streets."  § 3.1.1.

¶ 44     Enacted in 2000, the guiding principles and policies established in the Plan (as well as those in Blueprint Denver) form

21

the basis for the goals and recommendations of subsequent City plans. The Plan identifies numerous goals, including environmental sustainability, adopting effective land use policies, preserving Denver's legacies such as tree-lined streets, and improving Denver's neighborhoods. The Plan identifies several strategies to meet these goals, including the following:

• Environmental Sustainability Strategy 2-F: "Promoting infill development within Denver at sites where services and infrastructure are already in place";

• Land Use Strategy 3-B: Managing growth and change through effective land use policies, including "encourag[ing] quality infill development that is consistent with the character of the surrounding neighborhood; [and] that offers opportunities for increased density";

• Neighborhood Strategy 1-E: "Modify[ing] land-use regulations to ensure flexibility to accommodate changing demographics and lifestyles," and "[a]llow . . . a diverse mix of housing types and affordable units"; and

22

• Neighborhood Strategy 1-F: Investing in neighborhoods "to help meet citywide goals and objectives for a range of housing types and prices, community facilities, human services and mobility."

¶ 45    The City Council also adopted Blueprint Denver "to implement and achieve the vision outlined in Plan 2000." Blueprint Denver, at 3.

¶ 46    According to Blueprint Denver, which is considered a "supplement" to the Plan, "Arterials are designed to provide a high degree of mobility and generally serve longer vehicle trips to, from, and within urban areas." *Id.* at 51. "Denver's arterial system interconnects major urban elements such as the central business district, employment centers, large urban and suburban commercial centers and residential neighborhoods." *Id.* "Arterial streets serve a city-wide function and are, therefore, designated using a broader city-wide perspective." *Id.*

¶ 47    Blueprint Denver also identifies "Areas of Change" and "Areas of Stability." *Id.* at 120, 127. The parcel here is located in an Area of Stability directly adjacent to an Area of Change. An Area of Stability aims to "maintain the character of these areas yet accommodate some new development and redevelopment to prevent

23

stagnation." *Id.* at 5.  Like the Plan, Blueprint Denver identifies numerous strategies to meet this goal.  These include: (1) "[a]ddress[ing] incompatible zoning and land use issues"; (2) "[a]ddress[ing] edges between Areas of Stability and Areas of Change"; and (3) encouraging "[d]iversity of housing type, size, and cost."  *Id.* at 25.  Blueprint Denver explicitly identifies a "regulatory toolbox" to help implement these strategies in an Area of Stability.  *See id.* at 123.  One such "tool" is the use of zoning amendments to "create a better match between existing land uses [in an area] and the zoning."  *Id.* at 124.

¶ 48     Blueprint Denver divides Areas of Stability into "committed areas" and "reinvestment areas," although it does not identify these areas on a map.  *Id.* at 123.  It defines reinvestment areas as "neighborhoods with a character that is desirable to maintain but that would benefit from reinvestment through modest infill and redevelopment or major projects in a small area."  *Id.* at 122. Indicators of reinvestment areas within an Area of Stability include "deteriorated and poorly maintained housing stock," "inappropriate land uses or inadequate buffering between uses," "lack of curbs," and a need to maintain affordable housing.  *Id.* at 122-23.

24

## C.   Analysis

¶ 49   The district court found that the record supported the City Council's determination that Cedar's proposed rezoning was consistent with both the Plan and Blueprint Denver.  We agree with its analysis.

¶ 50   First, the rezoning is consistent with the objectives and strategies of the Plan and Blueprint Denver.  As the CPD found and some City Council members noted during the June 2015 hearing, the proposed rezoning allows for infill development along a residential arterial and near a commercial arterial, which ensures the availability of transit and other services.  Other members also noted that the proposed Cedar rezoning was not too far outside the character of the neighborhood and it created diversity of housing stock in the area — which, as Council member Nevitt noted, is needed as Denver continues to grow, bearing in mind that the preservation of old neighborhoods is still valuable while preventing sprawl.

¶ 51   Further, the rezoning would revitalize the parcel, which contained a "deteriorating and poorly maintained church" and thus could be characterized as a reinvestment area in an Area of

Stability, despite the absence of a specific map designation.[5]
Moreover, because the parcel is on the edge of an Area of Stability,
with multi-family buildings across South Monaco Parkway in an
Area of Change, the rezoning would, as some City Council members
noted, "address the edge" to the west and create a "buffer" between
South Monaco Parkway and the Crestmoor neighborhood.

¶ 52    Second, we agree with the district court that competent
evidence in the record supports the City Council's determination
that the rezoning furthers the public health, safety, and general
welfare.  As noted by the district court, the CPD presented evidence
to the City Council showing that the "redevelopment of the site
removes a poorly maintained structure, improves character along
Monaco, and residents have access to recreation, jobs and
commercial activities."  The evidence also indicated that the
rezoning would increase public safety because of the addition of
new sidewalks.

¶ 53    The neighbors argue, however, that the City Council refused to
consider the adverse traffic and parking consequences of the

---

[5] At oral argument, counsel for the neighbors stated that building
has now commenced on the site pursuant to the plan approved by
the City Council.

rezoning when it considered whether rezoning would further the public health, safety, and welfare. The City responds that adverse traffic and parking consequences are not a mandatory aspect of its calculus when considering a rezoning.

¶ 54    We agree with the district court that the consideration of the public health, safety, and welfare criterion may, in certain instances, include a review of issues relating to traffic and parking. *See Town of Grand Lake v. Lanzi*, 937 P.2d 785, 789 (Colo. App. 1996). Further, section 12.4.10.4(G)(2) of the DZC mandates that the City Council shall consider "any other comments received" at a public hearing on a proposed zoning amendment, which, in this case, would include comments related to traffic and parking. We conclude that the City Council considered comments concerning the traffic and parking consequences of the rezoning.

¶ 55    As the district court recognized, the record shows that several City Council members stated that the "major issue" was traffic and transportation and that they "need[ed] to address it." The City Council members acknowledged that Cedar had altered its original plans to address parking and traffic concerns by reducing the number of units built, increasing the number of parking spaces,

27

and altering the entrances to the complex to avoid disrupting quiet streets. Therefore, we conclude that the City Council sufficiently considered the traffic and transportation consequences of the proposed rezoning.

¶ 56    Finally, competent evidence exists in the record to support the City Council's conclusion that justifying circumstances existed for the rezoning. As noted above, the DZC provides that a justifying circumstance exists when either the land *or* its surrounding environs have changed or are changing. § 12.4.10.8(A)(4). The neighbors assert that "land" refers to the overall neighborhood itself, rather than the parcel subject to rezoning. The City argues that "land" refers to the parcel.

¶ 57    Like the district court, we defer to the City's interpretation for two reasons. First, we may defer to a government body's construction of the code, as long as it is reasonable; however, we are not bound by it, since our review of such code provisions is de novo. *See City of Commerce City v. Enclave West, Inc.,* 185 P.3d 174, 178 (Colo. 2008). Further, in reviewing the agency's construction, we apply the basic rules of statutory construction.

28

*See McCarville v. City of Colorado Springs*, 2013 COA 169, ¶ 15, 338 P.3d 1033, 1037.

¶ 58    We conclude the City Council's interpretation is persuasive, because if "land" referred to both the parcel subject to rezoning and the surrounding neighborhood, then the term "surrounding environs" would be superfluous. *See Doubleday v. People*, 2016 CO 3, ¶¶ 19, 20, 364 P.3d 193, 196 (When interpreting a statute, the court "read[s] statutory words and phrases in context" and "construe[s] them according to the rules of grammar and common usage." It "must avoid constructions that would render any words or phrases superfluous or lead to illogical or absurd results.").

¶ 59    Here, both the parcel and its surrounding environs have changed. Since Blueprint Denver was adopted, the church on the parcel deteriorated. At the June 2015 hearing, commentators observed that the church was blighted. Additionally, the area around Monaco Parkway has developed significantly. These changed circumstances were raised at the hearing before the City Council. We thus conclude that the City Council relied on competent evidence to determine that rezoning was in compliance with justifying circumstances.

¶ 60    Based on the evidence in the record, we conclude that the neighbors have failed to demonstrate that the determination of the City Council was an abuse of discretion. The lengthy deliberations show that Council members discussed the criteria and evidence in the record, including testimony presented by both opponents and proponents at the hearing. Therefore, the neighbors have failed to demonstrate that the City Council's approval of the proposed rezoning was arbitrary and capricious, *see Puckett v. City & Cty. of Denver*, 12 P.3d 313, 314 (Colo. App. 2000), and they have not overcome the presumption that the City Council's decision was proper. *Lieb v. Trimble*, 183 P.3d 702, 704 (Colo. App. 2008).

## IV. Unlawful Spot Zoning

¶ 61    The neighbors' final contention is that the rezoning constitutes impermissible spot zoning because it did not further Denver's comprehensive plans and thus was an abuse of discretion. We disagree.

### A. Standard of Review

¶ 62    The same standard of review outlined in Part II.A applies to this claim.

30

## B. Applicable Law

¶ 63  Spot zoning examines "whether the change in question was made with the purpose of furthering a comprehensive zoning plan or [was] designed merely to relieve a particular property from the restrictions of the zoning regulations." *Clark v. City of Boulder*, 146 Colo. 526, 531, 362 P.2d 160, 162 (1961) (rezoning of part of a planned residential area to allow a gas station was arbitrary). In other words, spot zoning "creates a small island of property with restrictions on its use different from those imposed on the surrounding property." *Little v. Winborn*, 518 N.W.2d 384, 387 (Iowa 1994) (citation omitted). If the rezoning is for the purpose of furthering a comprehensive zoning plan or based on changed conditions, the rezoning is not spot zoning. *See King's Mill Homeowners Ass'n v. City of Westminster*, 192 Colo. 305, 312, 557 P.2d 1186, 1191 (1976); *see also* 3 Arden H. Rathkopf & Daren A. Rathkopf, *Rathkopf's The Law of Zoning and Planning* § 41:8 (4th ed. 2016). Likewise, reclassifications when the "new use is consistent with others in the surrounding area" or where a rezoning will "allow multifamily residences within a single family zone" are also generally permissible. 3 Rathkopf & Rathkopf, § 41:8.

## C. Analysis

¶ 64     Here, as discussed above and shown on various maps considered by the City Council, the rezoning is not out of character with the adjacent area. Instead, it furthers the goals of both the Plan and Blueprint Denver. It "address[es] the edge" of an Area of Stability where hundreds of multifamily units are located directly across the street in an Area of Change. The approved rezoning also creates a "buffer" between South Monaco Parkway and the Crestmoor neighborhood. In addition, it will increase the "diversity of housing" choices. Finally, Blueprint Denver expressly recognizes rezoning as one "tool" for use in Areas of Stability like the Crestmoor neighborhood. Blueprint Denver, at 124. Rezoning is consistent with and contemplated by the adopted plans.

¶ 65     Despite the neighbors' assertion that the parcel is in the middle of a single-family neighborhood, the parcel's surrounding properties, including immediately adjacent properties, contain a variety of different zoning designations, including the same S-MU-3 zoning. In fact, the property directly to the parcel's south has the same S-MU-3 zoning. The properties across South Monaco Parkway are zoned R-2-A, a classification that permits multi-unit

32

homes.  The property directly east of the parcel is home to a number of apartments.  Only the property immediately to the southwest is zoned for single-family houses.  Thus, rezoning the parcel to S-MU-3 is in line with the zoning restrictions of the surrounding properties.

¶ 66     We conclude that the new zone designation is consistent with the surrounding areas and does not constitute spot zoning.  *See* 3 Rathkopf & Rathkopf, § 41:8.

## V.    Conclusion

¶ 67     Accordingly, the judgment is affirmed.

JUDGE NAVARRO and JUDGE PLANK concur.