The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
February 13, 2020

**2020COA28**

**No. 18CA2454, *Hajek v. Bd. of Cty. Commr's for Boulder Cty.* — Government — Local Government Regulation of Land Use — Adequate Water Supply for Development**

Section 29-20-303, C.R.S. 2019, requires that when a local government is considering a development permit it must review the adequacy of the proposed water supply if the development includes "new water use," as used in section 29-20-103(1)(b), C.R.S. 2019, in an amount exceeding a defined threshold. In a matter of first impression, a division of the court of appeals concludes that the phrase "new water use" encompasses a change in either the quantity of the water used or the purpose for which the water is used.

Court of Appeals No. 18CA2454
Boulder County District Court No. 18CV30183
Honorable Thomas F. Mulvahill, Judge

Sara Susie Hajek,

Plaintiff-Appellant,

v.

Board of County Commissioners for Boulder County, Colorado; Fair Farm, LLC, a Colorado limited liability company; and Walter F. Pounds,

Defendants-Appellees.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division II
Opinion by JUDGE TOW
Webb and Terry, JJ., concur

Announced February 13, 2020

Spencer Fane LLP, Jacob F. Hollars, Gilbert F. McNeish, Denver, Colorado, for Plaintiff-Appellant

Ben Perlman, County Attorney, David Hughes, Deputy County Attorney, Katherine A. Burke, Senior Assistant County Attorney, Boulder, Colorado, for Defendant-Appellee Board of County Commissioners for Boulder County, Colorado

Lyons Gaddis Kahn Hall Jeffers Dworak & Grant, P.C., Timothy J. O'Neill, Longmont, Colorado, for Defendant-Appellees Fair Farm, LLC and Walter F. Pounds

¶ 1    State law requires that before a local government approves a development permit involving a significant "new water use," the local government must consider the adequacy of the development's proposed water supply.  § 29-20-103(1)(b), C.R.S. 2019.  In this C.R.C.P. 106(a)(4) action, we must determine, as a matter of first impression, whether the term "new water use" encompasses only the use of additional water, or also includes water put to a different purpose.  We conclude that the legislature intended the term to have the latter definition.  In so doing, we conclude that the Board of County Commissioners for Boulder County (Board) abused its discretion by granting conditional approval of the application by Walter F. Pounds and Fair Farm, LLC (collectively, Fair Farm) for Site Plan Review (SPR) without considering the adequacy of the proposed water supply.  As a result, we reverse and remand with directions.

## I.    Background

¶ 2    Fair Farm sought to transition the use of its property from primarily grazing and hay production to an organic farm that would include "laying hens in mobile houses in rotation with vegetable production."  Because Fair Farm's proposed operation required

1

building new structures on vacant land subject to a protective conservation easement owned by Boulder County, the construction was subject to SPR under the Boulder County Land Use Code. Accordingly, Fair Farm submitted an application for SPR to the Boulder County Land Use Department (Department).

¶ 3    In its application and accompanying narrative, Fair Farm proposed building twelve mobile chicken houses, four greenhouses, and structures for processing and storing eggs and harvested crops. When Fair Farm later submitted the Fair Farm Operating Plan & Best Management Practices (Operating Plan), it reported that each chicken house would contain approximately four hundred hens.[1] While Fair Farm had originally listed the Little Thompson Water District as its proposed water supply for the operation, the Operating Plan specified that Fair Farm would instead use a thirty acre-foot water right from the Hessler Slough, though it never identified how much water the operation would require.

¶ 4    The Director of the Department conditionally approved Fair Farm's application, opening a fourteen-day public comment period

---

[1] Thus, the operation would house approximately 4800 hens.

2

during which members of the community, including the appellant, Sara Hajek (the owner of a parcel adjacent to the proposed operation), submitted written comments voicing concerns over air and water quality, odors, increased traffic, attraction of natural predators to the area, and the adequacy of the water supply. The Director then referred the application to the Board to determine whether a public hearing would be required. The Board determined that a hearing was not necessary and, in doing so, finalized the Director's conditional approval of Fair Farm's application.

¶ 5 Hajek challenged the Board's decision under C.R.C.P. 106. The district court affirmed the Board's decision. Hajek now appeals.

## II. Standard of Review

¶ 6 "Review of a governmental body's decision pursuant to Rule 106(a)(4) requires an appellate court to review the decision of the governmental body itself rather than the district court's determination regarding the governmental body's decision." *Bd. of Cty. Comm'rs v. O'Dell*, 920 P.2d 48, 50 (Colo. 1996). Our review is limited to deciding whether the governmental body's decision was an abuse of discretion, based on the evidence in the record before

it, or was made in excess of its jurisdiction.  C.R.C.P. 106(a)(4)(I); *Whitelaw v. Denver City Council*, 2017 COA 47, ¶ 7.

¶ 7    A governmental body abuses its discretion if it misinterprets or misapplies the law or if no competent record evidence supports its decision.  *Alpenhof, LLC v. City of Ouray*, 2013 COA 9, ¶ 9; *Berger v. City of Boulder*, 195 P.3d 1138, 1139 (Colo. App. 2008).  There is no competent evidence in the record if "the governmental body's decision is 'so devoid of evidentiary support that it can only be explained as an arbitrary and capricious exercise of authority.'"  *O'Dell*, 920 P.2d at 50 (quoting *Ross v. Fire & Police Pension Ass'n*, 713 P.2d 1304, 1309 (Colo. 1986)).  Thus, we will reverse the Board's decision if we determine that it erroneously interpreted the law or made a decision that is unsupported by the record.  *Nixon v. City & Cty. of Denver*, 2014 COA 172, ¶ 12.

¶ 8    Whether the Board abused its discretion in this instance turns on the interpretation of several Colorado statutes, which we review de novo.  *Friends of the Black Forest Pres. Plan, Inc. v. Bd. of Cty. Comm'rs*, 2016 COA 54, ¶ 15.

## III. Discussion

### A. The Phrase "New Water Use" Includes Water Put to a Different Purpose

¶ 9    Hajek contends that the Board failed to comply with section 29-20-303(1), C.R.S. 2019, which provides in pertinent part:

> A local government shall not approve an application for a development permit unless it determines in its sole discretion, after considering the application and all of the information provided, that the applicant has satisfactorily demonstrated that the proposed water supply will be adequate.

As relevant here, section 29-20-103(1)(b), C.R.S. 2019, limits the definition of "[d]evelopment permit" to

> an application regarding a specific project that includes new water use in an amount more than that used by fifty single-family equivalents, or fewer as determined by the local government.

¶ 10    The Board and Fair Farm respond that the statute does not apply to Fair Farm's application because the proposed laying hen operation did not involve a "new water use." Therefore, they contend, the Board's SPR was not the approval of a "development permit."

¶ 11    To resolve this threshold issue, we must consider the meaning of "new water use" as it is used in section 29-20-103(1)(b).  When interpreting a statute, our goal is to "ascertain and give effect to the legislature's intent."  *Roup v. Commercial Research, LLC*, 2015 CO 38, ¶ 8.  To do so, we look first to the language of the statute and give words their plain and ordinary meaning.  *Id.*  Unless the statutory language is ambiguous, we presume the General Assembly meant what it said.  *United Airlines, Inc. v. Indus. Claim Appeals Office*, 993 P.2d 1152, 1157 (Colo. 2000).  In addition, we construe the statute as a whole to give consistent, harmonious, and sensible effect to all its parts, and we presume that the legislature intended the entire statute to be effective.  *People v. Buerge*, 240 P.3d 363, 367 (Colo. App. 2009).  We also avoid interpretations that would render any words or phrases superfluous or would lead to illogical or absurd results.  *People v. Null*, 233 P.3d 670, 679 (Colo. 2010).

¶ 12    Our inquiry centers on the meaning of the word "new" in this context.  In our view, it can be understood in two ways.  "New" can be interpreted here as meaning "additional" — as in an additional

quantity of water — and as meaning "different" — as in a different purpose for which water is used.

¶ 13     While the word "new" can be defined in a number of ways depending on the context, the applicable dictionary definitions here are "having originated or occurred lately," "being other than the former or old," and "different or distinguished from a person, place, or thing of the same kind or name that has longer or previously existed." Webster's Third New International Dictionary 1522 (2002). Under any of these definitions, the word "new" does not exclusively mean additional. Rather, "new" is broad enough to also include a use that differs from prior use. Thus, giving the word "new" its plain and ordinary meaning, we construe the phrase "new water use" to encompass both the use of additional quantities of water and the use of water for a different purpose.

¶ 14     Notably, when sections 29-20-303(1) and 29-20-103(1)(b) were enacted, the General Assembly also added language defining an "[a]dequate" water supply as one that "will be sufficient for build-out of the proposed development in terms of quality, quantity, dependability, and availability to provide a supply of water for the type of development proposed . . . ." § 29-20-302(1), C.R.S. 2019.

Thus, in determining if a water supply is adequate for a proposed development under section 29-20-303(1), a local government is required to consider not only the quantity of the water to be used, but the quality as well. *Id.* Because water quality is only relevant in the context of the purpose for which it is used, we draw two conclusions.

¶ 15    First, considering the quality of a water supply would not be necessary if the General Assembly had been solely concerned about development involving additional, as opposed to different, water use. But "quality" in this context indicates the General Assembly was also interested in the purpose for which water is used. Thus, a development's use of water for a different purpose is a sufficient "new water use" to trigger section 29-20-303(1) oversight.

¶ 16    Second, if the General Assembly had intended section 29-20-303(1) to apply only where additional quantities of water are used and not where water is merely used for a different purpose, the reference to water quality would be unnecessary. Because we must avoid interpretations that render words or phrases superfluous, we cannot construe "new water use" to exclude instances where the

same quantity of water is used for a different purpose. *Null*, 233 P.3d at 679.

¶ 17 Therefore, we conclude that the phrase "new water use" in section 29-20-103(1)(b) refers to the use of additional quantities of water as well as the use of a similar quantity of water for a different purpose. Thus, a "development permit" as referenced in section 29-20-303(1) includes approval of an application for a specific project where either (1) an additional use of water is required in the threshold amount set forth in section 29-20-103(b)(1) or (2) an amount of water exceeding the threshold set forth in section 29-20-103(b)(1) is to be used for a different purpose.[2]

### B. The Fair Farm Application Implicated Section 29-20-303(1)

¶ 18 We next turn to whether the approval of the Fair Farm application was a "development permit" within the meaning of section 29-20-103(1)(b) and thus triggered section 29-20-303(1).

¶ 19 The Board and Fair Farm argue that Fair Farm's SPR application was strictly limited to seeking approval to build the

---

[2] We note that "new water use" is not specifically defined in any Colorado statute. However, in several other Colorado statutes, "water use" implies purpose and not volume. *See, e.g.*, § 37-75-105(3)(a), C.R.S. 2019; § 37-97-103(5), C.R.S. 2019.

structures associated with the proposed operation, not for the operation itself. Indeed, as the Board and Fair Farm also point out, based on how the property is zoned, Fair Farm is already permitted by right to use the land for the envisioned laying hen operation without any special review or authorization. *See* Boulder County Land Use Code 4-502(D), Use Table 4-502.

¶ 20    Even so, because the proposed structures are intended to facilitate the operation, which includes water use, building the new structures necessarily implicates any "new water use" associated with the operation. Moreover, the Department conditioned approval in part on implementing prescribed management practices related to potential wildlife interactions with the hens and obtaining a permit for producing eggs, which indicates that the Department was also reviewing the operation as a whole in addition to the construction of the structures. For these reasons, we conclude that the approval of Fair Farm's application for SPR is within the scope of a development permit. § 29-20-103(1).

¶ 21    However, as noted, such a development permit only falls within the ambit of section 29-20-303(1) if the operation "includes new water use in an amount more than that used by fifty

10

single-family equivalents."[3] § 29-20-103(1)(b). Although neither the statute nor any regulation referenced by the parties establishes how much water would be used by fifty single-family equivalents, Hajek alleged in her complaint that "[a] single family equivalent is typically in the range of 0.4 to 0.6 acre-feet . . . [t]hus 'fifty single-family equivalents would require between 20 acre-feet and 30 acre-feet of water." She also alleged that Fair Farm's operation would require more than thirty acre-feet of water. On appeal, neither the Board nor Fair Farm argues that the amount of water required would be below this threshold.

¶ 22 In sum, because Fair Farm's operation includes "new water use," the statute required the Board to consider whether the amount of water used exceeded the threshold, and thus whether the Board had to review the application as a development permit under section 29-20-303(1). Because the Board did not do so, it

---

[3] While section 29-20-103(1)(b), C.R.S. 2019, allows a local government to set the standard at fewer than fifty single-family equivalents, Boulder County has not done so. Accordingly, the fifty single-family equivalent threshold provided in section 29-20-103(1)(b) applies.

11

abused its discretion by approving Fair Farm's application.[4] *See O'Dell*, 920 P.2d at 50.

C. The Record Does Not Demonstrate Adequate Water Supply

¶ 23 The Board and Fair Farm argue that, even if the statute applies to Fair Farm's application, reversal is not required because the record evidence demonstrates that the proposed water supply is adequate. We disagree.

¶ 24 First, while the Fair Farm application and Operating Plan alluded to two possible sources of water, nowhere did the application or other material Fair Farm submitted to the Department or Board indicate how much water the operation would require. In fact, the only indication in the record of the amount of water necessary for the operation is public comments submitted about the possible inadequacy of the supply. Without any estimate of how much water Fair Farm's operation will require, the Board could not have considered whether the proposed water supply

---

[4] We note that, in addition to considering the adequacy of the proposed water supply, the statute required the Board to consider the documentation outlined in section 29-20-304, C.R.S. 2019, which Fair Farm never submitted. § 29-20-305(a), C.R.S. 2019.

would be adequate.[5]  Similarly, if the record does not reflect how much water will be required by the operation, it cannot possibly contain sufficient evidence for us to conclude that the proposed water supply is adequate.

¶ 25     Moreover, as we have noted, a consideration of the adequacy of the water supply includes exploring the quality as well as the quantity of the water available.  Yet the record contains no information regarding whether the new operation will require water of a different quality than that required for the simple irrigation that has been occurring.

¶ 26     The Board and Fair Farm also essentially contend that the Board need only consider whether the applicant has proposed a water supply, and that it does not matter whether the applicant presently has the rights to that water.  While the latter half of this argument is correct, it only goes so far.

---

[5] Indeed, in the Board's answer to Hajek's complaint in the district court, its response to the allegations regarding the volume of water the operation would require was that the Board was "without knowledge and information sufficient to form a belief as to the truth of the allegations."  The Board's earlier disavowal of any knowledge regarding the amount of water involved cannot be reconciled with its assertion on appeal that the record reflects an adequate water supply.

¶ 27 True, the statute provides that the applicant does not have to "own or have acquired the proposed water supply or constructed the related infrastructure at the time of the application." § 29-20-303(2). This means precisely what it says: the Board cannot reject a development permit solely because the applicant has not yet obtained the rights to the water it proposes to use. But the Board must still consider whether, assuming the rights are obtained, the proposed water supply is adequate. Here, Fair Farm's proposed water supply was a "thirty acre-foot water right." Yet, as noted, the Board did not consider, and cannot say now, that this source would be adequate in terms of either quality or quantity.

¶ 28 Finally, the Board points out that "all determinations required under the enumerated provisions are made in the County's 'sole discretion'" and notes that it can delay addressing the adequacy of the water supply to a later date "if it became a relevant issue in the future." First, we reject any implication that a local government's decisions regarding the adequacy of a development's water supply are unreviewable by a court merely because such decisions are entrusted to the local government's "sole discretion." The district and appellate courts are clearly empowered to review such

14

decisions for an abuse of that discretion. *See* C.R.C.P. 106(a). Second, the Board's claim that it can consider the adequacy of the water supply whenever it deems it appropriate is contrary to the unequivocal statutory mandate that this consideration occur before any development permit is approved. § 29-20-303(1).

## IV.   Conclusion

¶ 29     The judgment is reversed, and the case is remanded to the trial court with directions to vacate the Board's conditional approval and remand the case to the Board to determine whether the development's water requirements exceed fifty single-family equivalents, and, if so, whether the applicant's proposed water supply is adequate.

JUDGE WEBB and JUDGE TERRY concur.