23CA1799 No Pipe Dream v Larimer County 10-03-2024

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA1799
Larimer County District Court No. 20CV30800
Honorable Laurie K. Dean, Judge
Honorable Gregory M. Lammons, Judge

---

No Pipe Dream Corporation, Save the Poudre, and Barry Feldman,

Plaintiffs-Appellants and Cross-Appellees,

v.

Larimer County Board of County Commissioners; Commissioner Tom Donnelly, in his official capacity as a Larimer County Commissioner; and Commissioner Steve Johson, in his official capacity as a Larimer County Commissioner,

Defendants-Appellees,

and

Northern Integrated Supply Project Water Activity Enterprise,

Defendant-Appellee and Cross-Appellant.

---

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE TOW
Kuhn and Taubman*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 3, 2024

---

Foote Law Firm LLC, Michael Foote, Louisville, Colorado, for Plaintiff-Appellant and Cross-Appellee No Pipe Dream Corporation

John M. Barth, Hygiene, Colorado, for Plaintiffs-Appellants and Cross-Appellees Save the Poudre and Barry Feldman

William G. Ressue, County Attorney, Frank Haug, Assistant County Attorney, Fort Collins, Colorado, for Defendants-Appellees

Trout Raley, Bennett W. Raley, Peggy E. Montaño, William Davis Wert, Vanya P. Akraboff, Denver, Colorado, for Defendant-Appellee and Cross-Appellant

Daniel L. Money, Windsor, Colorado, for Amicus Curiae Town of Windsor

Vranesh and Raisch, LLP, Peter C. Johnson, Andrea A. Kehrl, Robyn L. Smith, Boulder, Colorado, for Amicus Curiae Town of Erie

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1       Plaintiffs, No Pipe Dream Corporation, Save the Poudre, and Barry Feldman, appeal the district court's judgment entered in favor of defendants, Larimer County Board of County Commissioners (the Board), Commissioners Tom Donnelly and Steve Johnson, and Northern Integrated Supply Project Water Activity Enterprise (the Enterprise), affirming the Board's approval of the Enterprise's permit application for a water storage reservoir and transmission pipelines.  We affirm the judgment.

## I.       Background

¶ 2       In section 24-65.1-101(1)(a), C.R.S. 2024, the General Assembly declared that "[t]he protection of the utility, value, and future of all lands within the state . . . is a matter of public interest."  Local governments are thereby empowered to "designate [certain] areas and activities of state interest" and, after such designation, regulate such areas and activities.  § 24-65.1-101(2)(b). One such activity is the "[s]ite selection and construction of major new domestic water . . . systems."  § 24-65.1-203(1)(a), C.R.S. 2024.

¶ 3       Consistent with section 24-65.1-404, C.R.S. 2024, Larimer County designated as a matter of state interest the "[s]iting and development of new or extended domestic water or sewer

1

transmission lines which are contained within new permanent easements greater than 30 feet." Larimer Cnty. Land Use Code § 14.4(J) (effective until Mar. 31, 2021) (Land Use Code).[1] An entity that seeks to develop such a project must obtain Board approval.

¶ 4 One way of securing Board approval is to obtain a permit, known as a "1041 permit." A 1041 permit applicant must show that the project satisfies twelve review criteria delineated in section 14.10(D) of the Land Use Code. Relevant to this appeal, the second criterion is that "[t]he applicant has presented reasonable siting and design alternatives or explained why no reasonable alternatives are available." Land Use Code § 14.10(D)(2). In lieu of the 1041 permit process, the Land Use Code also allows for an intergovernmental agreement between the County and an applicant proposing to engage in an area or activity of state interest. Land Use Code § 14.8(A).

¶ 5 The Enterprise sought to develop a water storage reservoir, transmission water pipelines, and associated features, known as

---

[1] All citations to the Land Use Code will be to the version effective until March 31, 2021, as that was the version in effect at the time of the Board's action.

the Northern Integrated Supply Project (NISP). In 2016, the County and the Enterprise signed a memorandum of understanding pursuant to section 14.8(A)(5) of the Land Use Code prior to engaging in the process of negotiating an intergovernmental agreement authorizing the NISP. On November 14, 2019, the Enterprise notified the Board that it wished to switch from the intergovernmental agreement process to the 1041 permit application process because the Enterprise felt it would provide greater transparency and allow for more robust public participation.

¶ 6 On February 21, 2020, the Enterprise submitted a 1041 permit application for the development of the NISP. The two main components of the Enterprise's NISP 1041 permit application were the pipeline routes through Larimer County and the location of the Glade Reservoir. The application contained multiple memoranda, including sections applying generally to NISP, as well as some sections applying only to the pipelines and others applying only to Glade Reservoir.

¶ 7 In Technical Memorandum No. 1 – Project Description, the Enterprise addressed the reasonable alternatives criterion as follows:

> After many years of federal scientific studies and required environmental compliance with substantial public input, including input from Larimer County, approvals by the agencies of the State of Colorado and the permits issuing for the current project configuration, which is the subject of this permit application, *it is not possible at this juncture for the Applicant to submit a permit request for another Project configuration or alternative.* Having incongruent permit applications at various agencies is not a viable option, *therefore no reasonable alternatives are possible* at this time as the other state and federal permitting agencies have acted.

(Emphasis added.)

¶ 8     In Technical Memorandum No. 2 – Larimer County 1041 Evaluation Criteria, the Enterprise addressed the reasonable alternatives criterion for the pipelines specifically, saying "[a]fter further discussion with the County, the pipeline routing identified in the latest Technical Memorandum No. 3 is the final alignment, recognizing that minor adjustments may be necessary in specific locations." In Technical Memorandum No. 3 – Conveyance Pipeline Route Study & Analysis, the Enterprise presented its "preferred" pipeline route, as well as its prior analysis that supported selecting that route over several alternative routes.

¶ 9    Ultimately, the Board approved the permit by a vote of two to one, finding, as pertinent here, that the Enterprise had met section 14.10(D)(2) of the Land Use Code. Specifically, the Board found that

> [the Enterprise's] application presents a lengthy review of over 200 alternatives to NISP including alternative reservoir locations, expansion of existing reservoirs, use of ground aquifers in lieu of NISP, and a "No Action" plan where NISP would not be developed. Per the Army Corp of Engineers in the [Final Environmental Impact Statement], the proposed Glade Reservoir is the most appropriate and least impactful option when considering the mitigation plans imposed.
>
> Many alternative pipeline routes for each segment were studied and presented in the application. These route alternatives were along a specific line which allowed for evaluation of actual impacts. Numerous factors for the route combinations were evaluated, including disruption to surrounding property, existing development and utilities, the number of properties impacted, residential and urbanized areas, natural hazards, and environmental and wildlife impacts.

¶ 10    Plaintiffs filed a complaint in the Larimer County District Court challenging the Board's approval. They sought district court review of the Board's decision under C.R.C.P. 106(a)(4), contending that the Board had abused its discretion or exceeded its jurisdiction

5

by approving the Enterprise's 1041 permit application. They also sought a declaration under C.R.C.P. 57 (or, in the alternative, C.R.C.P. 106(a)(4)) that the participation of two of the county commissioners in the approval of the 1041 permit application violated plaintiffs' due process rights because the commissioners were biased and should have recused themselves. The district court dismissed the due process claim under C.R.C.P. 12(b)(5) and affirmed the Board's approval of the 1041 permit application.

## II.     Dismissal of the Due Process Claim

¶ 11     We first reject plaintiffs' contention that the district court erred by granting defendants' motion to dismiss the due process bias claim.

### A.     Standard of Review and Applicable Law

¶ 12     We review de novo a district court's order granting a C.R.C.P. 12(b)(5) motion to dismiss. *Williams v. Rock-Tenn Servs., Inc.*, 2016 COA 18, ¶ 9. We accept all factual averments in the complaint as true and view them in the light most favorable to the plaintiff. *Pub. Serv. Co. of Colo. v. Van Wyk*, 27 P.3d 377, 386 (Colo. 2001). We also review de novo a claim that a party's due process rights were violated. *Black v. Black,* 2020 COA 64M ¶ 103.

6

¶ 13    "The due process requirement of neutrality in adjudicative proceedings entitles a person to an impartial decision-maker." *No Laporte Gravel Corp. v. Bd. of Cnty. Comm'rs*, 2022 COA 6M, ¶ 41. "An impartial adjudication requires 'the absence of a personal, financial, or official stake in the decision evidencing a conflict of interest on the part of a decision-maker.'" *Id.* (quoting *Scott v. City of Englewood*, 672 P.2d 225, 228 (Colo. App. 1983)). "This concept encompasses both the absence of actual bias and the risk of actual bias." *Id.*

¶ 14    "These due process mandates are not limited to judicial officers." *Id.* at ¶ 44.

> [W]hen decision-making by nonjudicial officers bears sufficient similarities to the adjudicatory function performed by courts, we consider it "quasi-judicial" and thereby subject to the basic requirements of due process. While such actors must ensure the fundamental fairness of the proceeding, they are not held to the more rigorous disqualification standards applicable to judicial officers through ethical codes or local rules of procedure. Rather, the inquiry is simply whether actual bias or a risk of actual bias exists so as to compromise the neutrality of the quasi-judicial actor.

*Id.* (citations omitted).

¶ 15   "[T]hose serving in quasi-judicial capacities are presumed to act with 'integrity, honesty, and impartiality . . . .'" *Id.* at ¶ 45 (quoting *Scott,* 672 P.2d at 228).  To overcome this presumption and invalidate an agency action, a plaintiff must show "substantial prejudice."  *Whitelaw v. Denver City Council,* 2017 COA 47, ¶ 11; *No Laporte Gravel Corp.,* ¶ 45.  In this regard, a plaintiff must show that the conflict, if any, had an impact "on the outcome of the proceeding."  *Id.* at ¶ 12.

## B.   Analysis

¶ 16   Plaintiffs contend that the complaint sufficiently pleaded a due process bias claim.  In support of this contention, they point to allegations in the complaint regarding Donnelly's and Johnson's decade-long public advocacy in support of NISP, a text message sent by Donnelly, and an email sent by Johnson.  These allegations are insufficient to state a due process bias claim.[2]

---

[2] It is immaterial whether plaintiffs brought the due process violation claim pursuant to C.R.C.P. 57 or 106(a)(4) because either way, plaintiffs have failed to state a claim upon which relief may be granted.  Thus, we need not resolve the parties' dispute over whether an as-applied constitutional challenge is cognizable under C.R.C.P. 57.

8

### 1. Public Advocacy for a Decade

¶ 17 Plaintiffs highlight allegations in the complaint that both commissioners had publicly advocated for NISP for a decade, including that they met with the Enterprise to discuss NISP; advocated, publicly supported, and endorsed NISP; attended and spoke at multiple rallies organized by the Enterprise and supported/endorsed NISP at such events; made public statements supporting/endorsing NISP in their official capacities as commissioners; and allowed the Enterprise to list their names as supporting/endorsing NISP. They also point to allegations in the complaint that (1) the Enterprise prepared a document stating that its strategy was to meet with key people including Johnson and Donnelly to obtain their support/endorsement; and (2) the Enterprise thanked Johnson for his support in an email, and Johnson replied that he appreciated being mentioned in an article stating that all three commissioners supported NISP.

¶ 18 Reading these allegations in the light most favorable to plaintiffs and taking them as true, they do not allege that either commissioner had a personal, financial, or official stake in the decision of the Enterprise's 1041 permit application evidencing a

conflict of interest. At most, these communications demonstrate a public expression of opinion or the taking of a political stance on a policy matter before deciding a particular issue. "The taking of a public stance on a policy issue related to the upcoming hearing, however, 'does not, in the absence of a showing of bias, disqualify the decision-maker.'" *Meyerstein v. City of Aspen*, 282 P.3d 456, 468 (Colo. App. 2011) (quoting *Scott*, 672 P.2d at 228). Indeed, we agree with the district court that the public expects elected officials to make public comments on policy matters and that doing so before an election allows for greater transparency. Such conduct, without more, does not disqualify officials from their quasi-judicial role. *See id.*

¶ 19    Further, plaintiffs have not alleged facts sufficient to rebut the "presumption of integrity, honesty, and impartiality" because they have not alleged how these public comments had any impact on the outcome of the proceeding. *Whitelaw*, ¶ 11 (quoting *Scott*, 672 P.2d at 227). Plaintiffs did not allege in their complaint that either commissioner stated how he would vote on the Enterprise's 1041 permit application irrespective of what the quasi-judicial process revealed. *See City of Manassa v. Ruff*, 235 P.3d 1051, 1058 (Colo.

10

2010) ("[I]n the absence of evidence . . . the mere possibility" of prejudice "simply poses too remote and insubstantial a risk of actual bias" to implicate the guarantee of due process.). Thus, these statements do not evince actual bias or a risk of actual bias.[3]

## 2. Text Message

¶ 20 Plaintiffs also point to an allegation in their complaint regarding an August 2019 text message exchange between Donnelly and the Enterprise's Public Information Officer, in which Donnelly said, "You guys are getting ready to blow this deal," and "Northern has no idea what is in store for them if they let this slide into the next boards [sic] term." But Donnelly sent this text message when the Enterprise and the county were negotiating an intergovernmental agreement, as opposed to during the 1041 permit process. It was not until approximately three months after

---

[3] We decline to address plaintiffs' conclusory assertion that Donnelly's and Johnson's "public advocacy also violated [a]rticle XXIX[, section ](1)(c) of the Colorado Constitution by creating 'a justifiable impression among members of the public that such [public] trust is being violated' by their refusal to recuse themselves." *See Fisher v. State Farm Mut. Auto. Ins. Co.*, 2015 COA 57, ¶ 18 ("We generally decline to address arguments presented to us in a conclusory manner that are lacking citations to any supporting authority."), *aff'd*, 2018 CO 39.

this text message was sent that the Enterprise notified the Board that it wanted to switch from the intergovernmental agreement process to the 1041 permit process and approximately six months after this text message was sent that the Enterprise submitted its 1041 permit application.

### 3. Email

¶ 21    Finally, plaintiffs point to an email Johnson sent to someone named Mandy — who is not otherwise identified. In this email to Mandy, which appears to be a reply to a previous email (that is not in the record), Johnson said, "No it's not a bad joke. It's the result of a disgusting and disingenuous email blast by Save the Poudre[,] slanted and missing a lot of the facts designed to make the County look bad. Needless to say the[y] have lost ALL credibility with me." Johnson then discussed the time requirements for when 1041 permit hearings needed to take place under the law, that the Board had scheduled the hearing as late as possible, and that the Board and an attorney were looking into whether the Board could delay the hearings. This email postdated the Enterprise's submission of its 1041 permit application but concerned the timing of the hearing rather than the substance of the Enterprise's 1041 permit

12

application. Moreover, it does not follow that Johnson would approve the Enterprise's 1041 permit application simply because Save the Poudre lost credibility with him. Therefore, this email exchange does not evince actual bias or a risk of actual bias with respect to the 1041 permit process.

¶ 22　In sum, plaintiffs' complaint failed to sufficiently allege a due process violation. Thus, the district court did not err by dismissing this claim.

### III.　Reasonable Siting and Design Alternatives

¶ 23　We turn, then, to the merits of plaintiffs' challenge to the Board's approval of the 1041 permit. Plaintiffs contend that the Board abused its discretion by finding that the Enterprise's 1041 permit application satisfied section 14.10(D)(2) of the Land Use Code. We discern no reversible error.

### A.　Standard of Review and Applicable Law

¶ 24　"Review of a governmental body's decision pursuant to Rule 106(a)(4) requires an appellate court to review the decision of the governmental body itself rather than the district court's determination regarding the governmental body's decision." *No Laporte Gravel Corp.*, ¶ 23 (quoting *Bd. of Cnty. Comm'rs v. O'Dell,*

13

920 P.2d 48, 50 (Colo. 1996)).  "Our review is limited to deciding whether the governmental body's decision was an abuse of discretion, based on the evidence in the record before it, or was made in excess of its jurisdiction."  *Id.*  "A governmental body abuses its discretion if it misinterprets or misapplies the law or if no competent record evidence supports its decision."  *Id.* at ¶ 24.

¶ 25     We review and interpret the Land Use Code de novo and apply ordinary rules of statutory interpretation.  *Id.* at ¶ 26.

### B.    Analysis

¶ 26     The Enterprise argues that it satisfied the criterion in section 14.10(D)(2) both for the proposed reservoir and for the proposed pipelines.

¶ 27     As to the siting of the reservoir, the Enterprise contends that it explained that no alternatives could be presented because of the yearslong process that had already taken place to obtain federal approval of the reservoir location.

¶ 28     Plaintiffs argue that this explanation fails to comply with the requirements of section 14.10(D)(2) of the Land Use Code because it does not "provide any legal or technical support for why no reasonable siting and design alternatives were available."  They

14

further contend that to allow the federal approval process to take precedence "renders meaningless the County's authority over site selection and design of major water projects" and is inconsistent with section 14.6(B) of the Land Use Code, which provides that "[r]eview or approval of a project by a federal or state agency does not obviate, and will not substitute for, the need to obtain a 1041 permit for that project."

¶ 29    As for the pipeline component of its application, the Enterprise contends that it elected to comply with section 14.10(D)(2) of the Land Use Code by "presenting reasonable siting and design alternatives." Specifically, the Enterprise submitted Technical Memorandum No. 3, which provided a "'site analysis process and specific review criteria' for alternative pipeline routes."

¶ 30    Plaintiffs counter that the alternatives discussed in Technical Memorandum No. 3 were nothing more than options that *the Enterprise* had considered and rejected. The permit application, on the other hand, only presented to the Board the Enterprise's single *preferred* pipeline route. Plaintiffs argue that the generally applicable statement in Technical Memorandum No. 1 — that it was not possible to present an alternative configuration for the

project — makes it clear that Technical Memorandum No. 3 did not present alternatives for *the Board's* consideration but, rather, simply discussed options that the Enterprise had already ruled out.

¶ 31    Given the Board's language in its finding, it is not entirely clear whether the Board determined that the Enterprise had satisfied section 14.10(D)(2) by providing alternatives or by explaining that none could be provided. While the Board observed that the application "present[ed] a lengthy review of over 200 alternatives" for the reservoir location, it did not say *the Board* considered these alternatives; rather, it explained that the Army Corps of Engineers had concluded that the proposed reservoir location was the "most appropriate and least impactful option." As for the pipelines, the Board described, in passive language, that "[m]any alternative pipeline routes for each segment were studied and presented in the application" and that numerous factors "were evaluated" — not saying whether the Board evaluated these alternatives or factors.[4]

---

[4] Notably, the record reflects that county representatives had provided input during the discussions with the federal government as well — even before the 1041 permit application was filed.

¶ 32    But we need not resolve whether the Board considered alternatives or, instead, accepted the assertion that no alternatives were viable.  The requirement of section 14.10(D)(2) is stated in the disjunctive — "[t]he applicant has presented reasonable siting and design alternatives *or* explained why no reasonable alternatives are available."  (Emphasis added.)  There is record support for either conclusion.[5]  Thus, regardless of which path the Board took in finding that this criterion was met, we cannot say it abused its discretion.  *See No Laporte Gravel Corp.*, ¶ 24.

¶ 33    Nor do we agree with plaintiffs' objection that the Board's action essentially abdicated its authority over site selection and design.  It was certainly within the Board's power to agree with the federal government's determination.  Similarly, we reject plaintiffs' contention that the Board's action runs afoul of section 14.6(B) of the Land Use Code.  That provision means only that,

---

[5] Plaintiffs' contention that there is no record support is unavailing. Their arguments simply ask us to reweigh the evidence, which we cannot do.  *See No Laporte Gravel Corp. v. Bd. of Cnty. Comm'rs,* 2022 COA 6M, ¶ 25 ("Because we are not the fact finder, we 'cannot weigh the evidence or substitute our own judgment for that of the [administrative body].'" (quoting *Kruse v. Town of Castle Rock,* 192 P.3d 591, 601 (Colo. App. 2008))) (alteration in original).

17

notwithstanding receiving the approval of the federal government, the Enterprise had to seek the Board's approval of a 1041 permit. It did so.

¶ 34 Because the Board did not abuse its discretion, we affirm the district court's judgment.

## IV. Disposition

¶ 35 The judgment is affirmed.

JUDGE KUHN and JUDGE TAUBMAN concur.